[No. A131882. First Dist., Div. Five. Dec. 11, 2012.]

KENNETH LUI, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

**COUNSEL**

Murray & Associates and Lawrence D. Murray for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Elizabeth S. Salveson, Chief Labor Attorney, and Erik A. Rapoport, Deputy City Attorney, for Defendant and Respondent.

**OPINION**

**SIMONS, J.**—Following a court trial, the trial court entered judgment in favor of defendant and respondent City and County of San Francisco (defendant) on causes of action brought by plaintiff and appellant Kenneth Lui (plaintiff) under the California Fair Employment and Housing Act

(FEHA) (Gov. Code, § 12900 et seq.).[1] Plaintiff, who had suffered a major heart attack, retired from his position as a police officer in the San Francisco Police Department (Department)[2] after the Department informed him there were no administrative positions available that did not require him to perform the strenuous physical duties regularly performed by patrol officers in the field. On appeal, plaintiff contends, among other things, the trial court erred in finding that strenuous duties—such as making forcible arrests and chasing fleeing suspects—are essential functions of the administrative positions he sought within the meaning of the FEHA. We affirm, concluding the evidence supports the trial court's finding that, even though officers in administrative positions are not frequently required to engage in such activities, the strenuous duties are essential functions of the positions because the Department has a legitimate need to be able to deploy officers in those positions in the event of emergencies and other mass mobilizations. On that ground, we reject plaintiff's discrimination and failure to accommodate claims under the FEHA. We also reject plaintiff's claim that defendant failed to engage in the interactive process mandated by the FEHA to attempt to determine a reasonable accommodation.

## BACKGROUND[3]

Plaintiff was hired by the Department as a police officer in 1981. On December 5, 2005, he suffered a heart attack and had five stents inserted. He was diagnosed with diabetes, high blood pressure, high cholesterol, and coronary artery disease. Following his heart attack, plaintiff took 11 months disability leave at full pay. On November 1, 2006, plaintiff returned to work in a 365-day temporary modified duty (TMD) assignment performing light-duty work in the records room.

Plaintiff's TMD assignment was pursuant to Department General Order (DGO) 11.12. DGO 11.12 was implemented in March 2004, following negotiations with the San Francisco Police Officers Association (POA). DGO 11.12 eliminated permanent light-duty assignments for officers injured after March 2004 and limited TMD assignments to one year. A TMD assignment is an assignment that "allows sworn members who have a temporary illness or injury to continue to serve in the Department when they are unable to

---

[1] All undesignated section references are to the Government Code.

[2] Although defendant is the City and County of San Francisco, this decision more frequently refers to the Department, which is responsible for the policies at issue in the present lawsuit.

[3] On appeal, we view the evidence in the light most favorable to the judgment and presume in its support the existence of every fact the trier could reasonably deduce from the evidence. (*In re Manuel G.* (1997) 16 Cal.4th 805, 825 [66 Cal.Rptr.2d 701, 941 P.2d 880].) Our factual summary reflects this standard of review. (See *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1056, fn. 1 [232 Cal.Rptr. 528, 728 P.2d 1163].)

perform the essential functions of their position."[4] Under DGO 11.12, at the end of the 365-day TMD period, an injured officer can return to full duty, request a disability accommodation (which may include a citywide job search under defendant's disability transfer policy), seek a disability retirement, seek an unpaid leave of absence, or take sick or family medical leave.

If the injured officer returns to full duty at the end of the TMD period, he must be able to perform the essential functions of the full duty police officer position, including physically strenuous tasks, even if assigned to an administrative position. Those essential functions are described in the Department's "Sworn Members Essential Job Functions" list (EJF List). The list is comprised of 11 groupings of duties, some of which include physically strenuous tasks, such as making forcible arrests, pursuing fleeing suspects, and responding to emergency situations.

Prior to the March 2004 implementation of DGO 11.12, the Department assigned disabled officers to permanent light-duty assignments. When an officer is in a light-duty assignment, the officer is unavailable for deployment in response to emergencies. In 1983, 15 officers were in permanent light-duty assignments; by 2003, there were 210 officers in such assignments. That was approximately 10 percent of the Department's sworn officers. In adopting DGO 11.12, the Department sought to decrease the number of sworn officers in permanent light-duty positions. After adoption of DGO 11.12, all of the officers in permanent light-duty positions were evaluated for their ability to return to full duty. Pursuant to an agreement with the POA, officers accommodated in light-duty positions prior to March 2004 were "grandfathered in" and permitted to remain in those positions if they were still unable to return to full duty. The personnel sergeant in the Department's medical liaison unit testified that "a majority" of the accommodated officers stayed in the same positions, but a "subset" of officers left the Department or returned to full duty. From August 2003 to September 2010, the number of officers in permanent light-duty assignments declined from 210 to 45.

In July 2007, Sergeant Michael Sullivan, the Department's ADA[5] coordinator during the relevant period, sent plaintiff a "Reasonable Accommodation Information and 90-Day Notice" confirming that plaintiff's TMD position would end on October 31, 2007. Sullivan enclosed a citywide reasonable accommodation request form, but plaintiff never filled out the form. At that time, plaintiff indicated to Sullivan that he felt he would be able to return to full duty. However, in August 2007, the cardiologist treating plaintiff, Dr. William Raskoff, stated in a note to the Department, "Mr. Lui may return

---

[4] Prior to taking a TMD assignment, an injured officer may take 365 days off with disability pay.

[5] ADA stands for the Americans with Disabilities Act of 1990. (42 U.S.C. § 12101 et seq.)

to full duty as a police officer. However, because he has coronary artery heart disease, his responsibilities should not include physically strenuous work." Sullivan told plaintiff that he could not return to full duty with those restrictions.[6]

On September 4, 2007, Dr. Raskoff provided a second note stating, "Mr. Lui may return to full duty as a police officer. However, because he has coronary artery disease, he should avoid physically strenuous work and minimize physical contact. He should self-monitor his activities." Sullivan told plaintiff that he had to get a less restrictive medical release if he wanted to return to full duty. Plaintiff told Sullivan that Dr. Raskoff told him that, if he physically struggled with a suspect, "it could cost [plaintiff] his life." Sullivan told plaintiff there were no vacant sworn police officer positions consistent with his medical restrictions.

On September 19, 2007, Sullivan sent plaintiff information about the possibility of conducting a search for nonsworn officer positions in the Department and citywide. Plaintiff was not interested in any position other than as a sworn officer due to his desire to maximize his pension.

On September 20, 2007, Sullivan wrote to Dr. Raskoff, informing him that "[f]ull duty police officers are often called upon to perform physically strenuous work" and asking him to "please clarify if [plaintiff] has the ability

---

[6] In response to one of plaintiff's interrogatories, defendant asserted that plaintiff's medical restrictions precluded him from performing eight out of the 11 functions in the EJF List, including the following duties, using the numbers and language of the EJF List:

"(1) Ability to effectively investigate potential crimes and criminal complaints, including but not limited to conducting surveillance, gathering physical and documentary evidence by searching people, places and things, interviewing witnesses and suspects, and synthesizing a wide range of information in written reports."

"(3) Ability to comprehend and follow oral directives, and report events in rapidly evolving and changing situations while maintaining a calm demeanor."

"(4) Ability to respond to service calls and emergency situations including, but not limited to, the ability to rescue and render aid to colleagues and members of the public as required by the situation at hand, securing crime scenes and directing traffic."

"(7) Ability to maintain good attendance and punctuality, and to work non-voluntary overtime."

"(8) Ability to make forcible arrests and detentions within the confines of Department policies and as mandated by law, including the ability to pursue fleeing suspects."

"(9) Ability to participate in, and meet the requirements/qualifications of Department mandated training."

"(10) Ability to work in a variety of assignments and in different shifts, alone or with a partner, for extended periods of time, including in critical incidents, declared emergencies, large-scale arrest incidents and civil unrest, with or without relief; ability to assume command of a crime scene or incident until relieved."

"(11) Ability to operate Department vehicles, communication devices and computers; ability to maintain firearm qualification in a manner prescribed by the Department and POST ([California's Commission on Peace Officer Standards and Training)]."

to perform the duties of a police officer." Dr. Raskoff responded that, "My opinion remains that because of [plaintiff's] coronary heart disease he should not participate in work requiring strenuous physical activity." On October 22, Dr. Raskoff faxed Sullivan a detailed medical consultation note from February, stating among other things that plaintiff "believes that he would not be able to perform th[e] work [of a patrol officer in an automobile,] which occasionally requires strenuous physical activity"; "feels that his symptoms that include exertional dyspnea and palpitations will limit him from being able to perform fully"; and "feels that he is capable of continuing to [work light duty]."

Shortly before plaintiff's TMD assignment expired, Sullivan informed him of a vacant assignment, language liaison, consistent with his restrictions. The position was created to improve the Department's relations with limited-English speakers in the community. Then Chief of Police Heather Fong waived for that position the requirement that the officer assigned be able to perform the duties in the EJF List. Plaintiff applied and was interviewed for the job, but another officer in a light-duty assignment was given the position.

On November 8, 2007, plaintiff's duty evaluation committee meeting took place. Plaintiff was offered the option of participating in a 60-day citywide job search to identify vacant positions that were not sworn police officer positions. He rejected that option because of the effect it would have on his police pension. Plaintiff opted to retire and to apply for an industrial disability retirement, which the Department agreed to support. His official retirement date was April 25, 2008.

*The Present Lawsuit*

In May 2008, plaintiff filed a lawsuit alleging five causes of action against defendant, including discrimination in violation of the FEHA; failure to accommodate in violation of the FEHA; failure to prevent discrimination in violation of the FEHA; retaliation in violation of the FEHA; and refusal to engage in the good faith accommodation process required by the FEHA. In April 2010, the trial court dismissed the retaliation claim pursuant to defendant's motion for summary adjudication. Following a court trial, the trial court issued a statement of decision and a subsequent amended statement of decision, ruling in favor of defendant on the remaining four claims. In March 2011, the court entered judgment in favor of defendant. This appeal followed.

DISCUSSION

As will be explained below, the key issue on appeal is whether the record supports the trial court's finding that the duties in the EJF List are essential

functions of the administrative positions sought by plaintiff. In particular, the court found that, although those duties are more typically performed by patrol officers, the duties are also essential functions of the Department's administrative positions because the Department has a legitimate need to be able to deploy officers in administrative positions in the event of emergencies and other mass mobilizations. Because plaintiff has not demonstrated the court's finding is unsupported by the record or is contrary to the FEHA, we affirm the judgment in favor of defendant.

## I.  *Standard of Review*

Because plaintiff challenges the sufficiency of the evidence supporting the trial court's decision, we apply the substantial evidence standard of review. (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445 [88 Cal.Rptr.2d 130].) "Substantial evidence means evidence which is of ponderable legal significance—evidence which is reasonable in nature, credible and of solid value. [Citation.]" (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099 [195 Cal.Rptr. 720].) "In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.]" (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76 [72 Cal.Rptr.3d 520].) "We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]" (*Id.* at p. 76.) The testimony of a single witness may be sufficient to constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) On the other hand, "[q]uestions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo. [Citation.]" (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604 [41 Cal.Rptr.3d 686].)

## II.  *Plaintiff's Discrimination and Failure to Accommodate Claims*

Plaintiff contends the trial court erred in failing to find that defendant violated the FEHA provisions barring disability discrimination and requiring employers to accommodate employees with disabilities. Plaintiff contends the Department was obligated to accommodate him by permanently assigning him to the records room or to one of the "150 to 250 administrative positions that [did] not include patrol or making arrests in 2007." Defendant does not deny there are numerous positions in the Department with primarily administrative duties, but defendant contends the FEHA does not prohibit the Department from requiring that officers in those assignments be able to perform the duties in the EJF List. Plaintiff, on the other hand, points out that

disabled officers were accommodated in permanent light-duty assignments prior to the adoption of DGO 11.12 and disputes the applicability of the EJF List to the administrative positions he seeks. We conclude that the record supports the trial court's finding that the duties in the EJF List are essential functions of the Department's administrative positions.

### A. *Basic Legal Principles*

The FEHA establishes separate causes of action for a range of " 'unlawful employment practices,' " including the three at issue in the present appeal: disability discrimination, failure to accommodate, and failure to engage in the good faith interactive process to determine a reasonable accommodation. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 961, 982, fn. 12 [83 Cal.Rptr.3d 190] (*Nadaf-Rahrov*).) We address plaintiff's discrimination and failure to accommodate claims in this part, and his claim regarding the interactive process in part III.[7]

The FEHA makes it an unlawful employment practice "[f]or an employer, because of the . . . physical disability [or] mental disability, . . . of any person, . . . to bar or to discharge the person from employment, . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a) (hereafter section 12940(a)).) "Although section 12940 proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties: 'This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.' " (*Green v. State of California* (2007) 42 Cal.4th 254, 262 [64 Cal.Rptr.3d 390, 165 P.3d 118] (*Green*), quoting § 12940(a)(1).) Thus, "[i]n order to prevail on a discriminatory discharge claim under section 12940(a), an employee bears the burden of showing (1) that he or she was discharged because of a disability, and (2) that he or she could perform the essential functions of the job with or without

---

[7] On appeal, plaintiff does not argue the trial court erred in dismissing his retaliation claim at the summary judgment stage. The claim is forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] (*Badie*).) Plaintiff's briefs on appeal assert in passing that defendant failed to take all reasonable steps to prevent discrimination. (§ 12940, subd. (k).) Because plaintiff has not provided reasoned argument with citations to authority on the issue, that claim is also forfeited. (*Badie*, at pp. 784–785.) In any event, the claim fails because we conclude plaintiff was not subjected to discrimination within the meaning of the FEHA.

accommodation (in the parlance of the [ADA], that he or she is a qualified individual with a disability). [Citation.]" (*Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 962; see also *Green*, at p. 262.)[8]

The FEHA also prohibits an employer from "fail[ing] to make reasonable accommodation for the known physical or mental disability of an . . . employee." (§ 12940, subd. (m).) "The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009–1010 [93 Cal.Rptr.3d 338].) A reasonable accommodation is "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 974.) As with a FEHA discrimination claim, the plaintiff bears the burden of proving that he or she had the "ability to perform the essential functions of a job with accommodation." (*Nadaf-Rahrov*, at p. 977.)

Thus, in order to prevail on *both* his claim for disability discrimination and his claim for failure to provide reasonable accommodation, plaintiff was required to show that he was able to perform the essential functions of the administrative positions he sought with or without reasonable accommodation. (See *Green, supra*, 42 Cal.4th at p. 264 ["an adverse employment action on the basis of disability *is not prohibited* if the disability renders the employee unable to perform his or her essential duties, even with reasonable accommodation"].) " 'Essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires. 'Essential functions' does not include the marginal functions of the position." (§ 12926(f).) The identification of essential job functions is a "highly fact-specific inquiry." (*Cripe v. City of San Jose* (9th Cir. 2001) 261 F.3d 877, 888, fn. 12 (*Cripe*); see also *Stone v. City of Mount Vernon* (2d Cir. 1997) 118 F.3d 92, 97 (*Stone*).)[9] Section 12926(f)(1) further provides that "A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following: [¶] (A) The function may be essential

---

[8] Although section 12940(a)(1) uses the phrase "essential duties" and the ADA uses the phrase "essential functions" (42 U.S.C. § 12111(8)), the phrases are interchangeable. (See *Green, supra*, 42 Cal.4th at p. 257; *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222, 1226, fns. 4 & 8 [37 Cal.Rptr.3d 899] (*Raine*).) Indeed, the FEHA defines the phrase "essential functions" but not the phrase "essential duties." (§ 12926, subd. (f) (hereafter section 12926(f)).) In this decision, we generally refer to a position's essential functions.

[9] *Cripe* and *Stone* were decided under the ADA, but the definition of "essential functions" under the ADA (29 C.F.R. § 1630.2(n) (2012)) is nearly identical to the definition of that term under the FEHA (§ 12926(f)(1), (2)). (See *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 770, fn. 2 [123 Cal.Rptr.3d 562] (*Cuiellette*).) "Although the Legislature has declared that [the] FEHA is intended to be independent of, and provide greater protection than, the ADA (see § 12926.1, subd. (a)), when, as here, provisions of the two acts are similarly

because the reason the position exists is to perform that function. [¶] (B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed. [¶] (C) The function may be highly specialized, so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." Moreover, section 12926(f)(2) states that "Evidence of whether a particular function is essential includes, but is not limited to, the following: [¶] (A) The employer's judgment as to which functions are essential. [¶] (B) Written job descriptions prepared before advertising or interviewing applicants for the job. [¶] (C) The amount of time spent on the job performing the function. [¶] (D) The consequences of not requiring the incumbent to perform the function. [¶] (E) The terms of a collective bargaining agreement. [¶] (F) The work experiences of past incumbents in the job. [¶] (G) The current work experience of incumbents in similar jobs." (§ 12926(f)(2).)

■ It is clear that plaintiff bore the burden of proving "that he or she is a qualified individual under the FEHA (i.e., that he or she can perform the essential functions of the job with or without reasonable accommodation)." (*Green, supra,* 42 Cal.4th at p. 260; accord, *Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 977.) It is less clear whether that burden included the burden of proving what the essential functions of the position are, rather than just plaintiff's ability to perform the essential functions. Under the ADA, a number of federal decisions have held that "[a]lthough the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions, . . . 'an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions.' [Citation.]" (*Bates v. United Parcel Service, Inc.* (9th Cir. 2007) 511 F.3d 974, 991 (*Bates*); see also, e.g., *Samper v. Providence St. Vincent Medical Center* (9th Cir. 2012) 675 F.3d 1233, 1237 (*Samper*); *E.E.O.C. v. Wal-Mart Stores, Inc.* (8th Cir. 2007) 477 F.3d 561, 568 (*E.E.O.C.*); *Maziarka v. Mills Fleet Farm, Inc.* (8th Cir. 2001) 245 F.3d 675, 680 (*Maziarka*).) However, *Samper, E.E.O.C.,* and *Maziarka* arose in the context of motions for summary judgment, and *Bates* and *Samper* described the employer's burden as a "burden of production" (*Bates,* at p. 991; *Samper,* at p. 1237), which is not the same as saying the employer bears the burden of proof on the issue at trial. Arguably, plaintiff's burden of proving he is a qualified individual includes the burden of proving which duties are essential functions of the positions he seeks. Ultimately, we need not and do not decide in the present case which party bore the burden of proof on the issue at trial because, even if defendant bore the burden of proving the duties in the EJF

worded, federal decisions interpreting the ADA are instructive in applying [the] FEHA. [Citations.]" (*Raine, supra,* 135 Cal.App.4th at p. 1226, fn. 7.)

List are essential functions of the administrative positions plaintiff seeks, the trial court's findings are supported by substantial evidence, as explained below.[10]

## B. *Essential Functions Analysis*

Defendant presented evidence and argument in an attempt to justify the duties in the EJF List under all three rationales in section 12926(f)(1). In affirming the judgment, we need not and do not decide whether those duties can be considered essential functions under the rationales in section 12926(f)(1)(A) and (C). As relevant to section 12926(f)(1)(A), defendant argues that the reason police officers exist is to enforce the law and protect public safety. Therefore, all police officers must be able to engage in the strenuous tasks in the EJF List, which relate to the apprehension of criminals and the protection of public safety. There is no dispute the Department exists for the purpose of law enforcement and the protection of public safety. Similarly, it is undisputed most of the Department's nonadministrative police officer positions, such as patrol assignments, exist for the purpose of enforcing the law and protecting the public through the performance of the types of duties in the EJF List. However, those undisputed facts do not mean that *all* police officer positions exist for the purpose of performing those functions. To the contrary, the evidence before the trial court showed that police officers assigned to administrative positions primarily perform a range of other functions that support the work of the officers in the field and the mission of the Department in innumerable ways. A strong argument can be made that those are the reasons the positions exist within the meaning of section 12926(f)(1)(A).

Similarly, as relevant to section 12926(f)(1)(C), defendant argues the law enforcement duties specified in the EJF List require specialized training, and Department police officers undergo a rigorous recruitment and training process focused on the types of duties in the EJF List. However, because the evidence in the record shows officers in administrative positions primarily fulfill other, administrative functions, the evidence highlighted by the Department arguably is insufficient to demonstrate officers in administrative positions are assigned to those positions "for [their] expertise or ability to perform the particular" duties in the EJF List. (§ 12926(f)(1)(C).)

---

[10] If we were to conclude plaintiff bears the burden of proof on the issue, it would be particularly difficult for him to prevail on appeal, because he would have to show that the evidence compelled a judgment in his favor. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528 [103 Cal.Rptr.3d 538].) It would not be enough for him to point to uncontradicted evidence that is sufficient to support the elements of his claims; the trier of fact is not required to believe even uncontradicted evidence. (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028 [213 Cal.Rptr. 69].)

However, regardless of whether the rationales in section 12926(f)(1)(A) and (C) are applicable, the evidence shows the duties in the EJF List *are* essential functions of the administrative positions at issue in the present case because there are a limited number of officers available to the Department to perform those functions. (§ 12926(f)(1)(B).) Because the Department only has a limited number of full duty officers, for each officer in a modified-duty assignment, there is one less officer available to be deployed in an emergency. In particular, the evidence before the trial court showed that, as of September 2010, there were 2,266 sworn police officers on the Department's payroll. Of those, 1,872 were full duty officers available for deployment, which was 99 officers short of the 1,971 full duty officers mandated by defendant's Charter.[11] The remaining sworn police officers included approximately 150 assigned to the airport;[12] 45 officers granted permanent light-duty assignments, mostly for injuries suffered prior to 2004;[13] 58 officers in TMD assignments; 76 officers on disability leave; 27 officers on disciplinary leave or suspension; and 30 officers on other types of leave. The Department's chief financial officer testified that, due to budget cuts, the number of full duty officers employed by the Department will "continue to decline."

The evidence further showed that the Department needs to be able to mobilize as many full duty police officers as possible to respond to mass celebrations, demonstrations, earthquakes and other large-scale emergencies, during which the officers would be required to perform the types of duties listed in the EJF List. For example, on the day of the 2003 invasion of Iraq there were tens of thousands of protestors and engagements in various parts of San Francisco. All full duty officers, including those in administrative positions, were mobilized. During such a full mobilization, all days off are canceled and all full duty officers work mandatory 12-hour shifts. Assistant Chief Schmitt testified, "we . . . left sort of bare-bones officers to handle the regular calls for service and pulled everyone else out into the field . . . , pulled extra officers from all the district stations, whatever they could spare. And then eventually you hit a number where you can't leave radio cars below that." She further testified, "[w]e remained mobilized for probably a week." The Department also fully mobilized during the torch run for the Beijing

---

[11] Section 4.127 of defendant's Charter states, "The police force of the City and County shall at all times consist of not fewer than 1,971 full duty sworn officers." (<http://www.amlegal.com/nxt/gateway.dll?f=templates&fn=default.htm&vid=amlegal:sanfrancisco_ca> [as of Dec. 11, 2012].)

[12] Assistant Chief Denise Schmitt testified the officers assigned to the airport were not available for deployment in the event of an emergency.

[13] It appears the group of 45 "ADA-accommodated" officers includes about 10 officers injured after 2004 who received accommodated positions. Those 10 positions were approved by the chief of police during an "interim" period after adoption of DGO 11.12 and "did not require the full essential functions of the police officer position."

Olympics, which involved a large demonstration. The Department made similar preparations for the verdict in the Mehserle trial;[14] all full duty officers, including those in administrative assignments, were required to be ready for deployment, in uniform with riot gear available.

In the event of a large earthquake, the Department must be able to mobilize as many full duty officers as possible to dig survivors out of collapsed buildings and respond to looting incidents. The Department's preparedness plan calls for "a full-scale mobilization, 12-hour shifts for all officers . . . responding in and handling both calls for service [and] rescue missions." The mobilization would include all full duty officers in administrative positions. When asked how many full duty police officers the Department would need to respond to a major earthquake, Captain Kevin Cashman testified, "We would need as many as possible, every possible officer out there would be the answer. There's no way to quantify it because we don't know if it's going to be a 6.0 or an 8.0. We wouldn't know if the casualties were in the hundreds or thousands. . . . [I] think we would need all of them." During the 1989 Loma Prieta earthquake, there was a full mobilization that lasted for about a week. Police officers set up perimeter lines to restrict entry into the affected area. Cashman testified the Department could have used more full duty officers at the time because "the officers were just exhausted, all of them."

Department resources are also taxed when there are multiple "critical" incidents in one night. For example, in the event of gang shootings, officers are deployed to saturate certain neighborhoods to prevent retaliatory shootings. Finally, officers in administrative assignments are deployed to special events, such as holiday celebrations, parades, and election night gatherings. These deployments include the types of strenuous duties in the EJF List. Assistant Chief Schmitt explained that any time officers are deployed to the field it is a "full duty assignment" because "[a]ny time a police officer is out in the field, any incident that occurs in front of them, anything that requires police action they are require[d] to act upon."

Moreover, although the Department has over 2,000 sworn officers, it is only able to deploy 300 to 400 officers in the field when the need arises for a full mobilization. If more officers were required, the Department would attempt to bring in officers from other jurisdictions. For example, Captain Cashman testified he deployed 300 to 400 officers for the Olympic torch run, and he contacted Alameda County to warn them he might need to call for assistance because he did not have any more officers to deploy. At trial, Cashman explained the Department can only deploy 300 to 400 officers because, even in the event of an emergency, the Department needs to continue to provide basic police services citywide. He testified, "We still have

---

[14] *People v. Mehserle* (2012) 206 Cal.App.4th 1125 [142 Cal.Rptr.3d 423].

to fulfill our basic mission as police officers to protect life and property. We're staffed to respond to calls for service for all of San Francisco. [¶] When you have a major issue like Mehserle coming down, the calls for service don't go away; if anything, they only increase. So we still have an obligation to respond to calls for services at the stations. A lot of times we sacrifice our beats and short-staff the stations, detail the beat officers to the demonstration. But it creates a real public safety issue in outlying districts if you don't have adequate staffing. It also creates . . . an officer safety issue. If officers don't have enough resources to do the job, they call for help, no one is coming. You need to staff that 24/7, three or four shifts a day at each station." Cashman also explained it is important to have full duty officers available to relieve other officers in sustained operations. Finally, he explained it would be problematic to deploy modified-duty officers in an emergency situation, because "[i]t would be very, very challenging to keep track" of officers with "specific individual restrictions" in the field.

The evidence showed that, prior to adoption of DGO 11.12, the Department was accommodating approximately 210 officers in permanent light-duty assignments, which was approximately 10 percent of the Department's sworn officers. After the 2004 adoption of DGO 11.12, which limited TMD assignments to 365 days, the number of officers in permanent accommodated status declined to 45 by September 2010. Thus, adoption of DGO 11.12, by requiring that officers be able to return to full duty status after a TMD assignment, substantially increased the size of the pool of full duty officers available for mobilization. This supports the trial court's finding that the duties in the EJF List are essential to the Department's administrative positions within the meaning of section 12926(f)(1)(B), because requiring that officers assigned to administrative positions be able to perform the EJF List duties helps the Department ensure it has enough officers available to perform those duties during times when mass mobilization is necessary.

Plaintiff points out that the Department's determination that DGO 11.12 was necessary to maintain readiness to respond to emergencies is not supported by any studies or formal analyses. However, plaintiff cites no authority that an employer's judgment in that respect must be supported by such studies and analyses, and plaintiff has not shown the evidence compelled the trial court to conclude that defendant's rationale was a pretext for discrimination or otherwise invalid. (See *Basith v. Cook County* (7th Cir. 2001) 241 F.3d 919, 929 (*Basith*) ["Cook County is allowed to determine the job responsibilities of its pharmacy technicians, it is not this court's duty to second-guess that judgment so long as the employer's reasons are not pretextual."]; *Miller v. Illinois Dept. of Corrections* (7th Cir. 1997) 107 F.3d 483, 485 [courts defer to an employer's judgment as long as reasons for requiring employees to perform a given function are "legitimate" and

"valid"].) The staffing needs of police departments are inherently unpredictable. (See *Holbrook v. City of Alpharetta, Ga.* (11th Cir. 1997) 112 F.3d 1522, 1528 (*Holbrook*) ["being prepared to respond to unexpected events is, in part, precisely what defines a police officer"].) We decline to second-guess the Department's judgment, supported by the POA, that significantly increasing the size of the pool of full duty officers available for mobilization is important to accomplish the Department's public safety mission.[15]

C. *Evidence of the Essential Functions Pursuant to Section 12926(f)(2)*

■   The trial court's essential functions finding is also supported by the evidence presented by defendant corresponding to the seven categories of evidence listed in section 12926(f)(2). "Usually no one listed factor will be dispositive . . . ." (*Stone, supra*, 118 F.3d at p. 97.)

First, defendant presented evidence it was the Department's judgment that the duties in the EJF List are essential to all sworn officer positions, including administrative positions. (§ 12926(f)(2)(A).) Formal adoption of the EJF List itself reflects such a judgment.[16] Moreover, Assistant Chief Schmitt and Captain Cashman testified at trial that the Department expects all full duty police officers to be able to perform those functions.

Second, defendant's job announcement includes the types of strenuous duties in the EJF List. (§ 12926(f)(2)(B).) The announcement stated, "Police officers perform a number of essential functions. For example, they patrol districts to prevent and detect crime; respond to calls for assistance; conduct criminal investigations; . . . pursue and arrest suspects; . . . [and] prepare for and participate in planned events . . . ." The duties listed in a job announcement are not conclusive—" 'an employer may not turn every condition of employment which it elects to adopt into . . . an essential job function, merely

---

[15] The fact that there were still 45 disabled officers working in permanent light-duty assignments as of September 2010 does not undermine the legitimacy of the Department's policy. Most of those officers were accommodated before the adoption of DGO 11.12; continuing those accommodations meant somewhat fewer officers available for full duty, but it did not defeat the overall policy reflected in DGO 11.12. Around 10 of those 45 officers were in positions exempted from the duties in the EJF List during an "interim" period after adoption of DGO 11.12. Plaintiff had the opportunity to apply for the language liaison position, which was the last of those 10 positions approved by the chief of police, but it was given to another disabled officer. Plaintiff does not cite to evidence that any of the other positions were vacant when he was seeking an accommodation.

[16] The EJF List was "fully adopted and approved" by the Department on December 19, 2007, more than a month after plaintiff's duty evaluation committee meeting and several months before his retirement. Plaintiff does not argue the timing of approval of the EJF List affects our analysis.

by including it in a job description.' [Citation.]" (*Davidson v. America Online, Inc.* (10th Cir. 2003) 337 F.3d 1179, 1191.) Nevertheless, the announcement is a relevant consideration, and plaintiff presents no evidence of separate written job descriptions for the administrative positions he seeks.

The third category is evidence of "[t]he amount of time spent on the job performing the function." (§ 12926(f)(2)(C).) This is the weakest category of evidence for defendant because the evidence shows most full duty officers in administrative positions spend most of their time performing administrative functions rather than the strenuous duties in the EJF List. However, the weakness of the evidence in this one category is not determinative. Where other considerations support a finding that a function is essential, the function "need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential." (*Basith, supra,* 241 F.3d at p. 929, fn. omitted; see also *Holbrook, supra,* 112 F.3d at p. 1527 ["Even assuming that an Alpharetta police detective spends a relatively small amount of time performing the type of field work that Holbrook concedes he cannot undertake, the record establishes—and Holbrook has not proven to the contrary—that the collection of all evidence at the scene of the crime is an essential function . . . ."].) In the present case, we have previously explained the evidence supporting the Department's determination that it is critical officers in administrative positions be available for full duty deployments, even if the circumstances requiring mass mobilizations do not arise very frequently. In any event, plaintiff presents no authority this evidentiary factor is dispositive, where other factors support the employer's determination that certain duties are essential functions of a position. (See *Basith,* at p. 929, fn. 2 ["[i]t is but one factor"].)

Fourth, as explained previously, defendant's evidence shows that the consequence of not requiring that officers in administrative positions be able to perform the duties in the EJF List (§ 12926(f)(2)(D)) is a significantly diminished pool of officers available for deployment in emergency situations and other situations requiring mass mobilization. On this point, plaintiff argues there is no evidence that, prior to adoption of DGO 11.12, the Department did not have enough full duty officers available for deployment. In fact, as outlined previously, there was testimony regarding officer shortages during at least the 1989 Loma Prieta earthquake and the 2003 antiwar protests. Moreover, given the Department's mandate to serve public safety and the unpredictability of the emergencies that may arise, it is legitimate for the Department to attempt to maximize the number of full duty officers available. The evidence does not demonstrate that there is such an overabundance of full duty officers that the Department's goal lacks justification.

The fifth category of evidence is whether the terms of the collective bargaining agreement with the POA support the finding the duties in the EJF

List are essential functions of the Department's administrative positions. (§ 12926(f)(2)(E).) The evidence in this category offers modest support for the court's finding. The Department met with the POA through a collective bargaining negotiations committee prior to adoption of DGO 11.12, the POA actively participated in drafting and revising DGO 11.12, and DGO 11.12 was attached to the 2007–2011 Memorandum of Understanding (MOU) between defendant and the POA. However, although DGO 11.12 reflects that officers must be able to perform the essential job functions before returning to full duty, it does not refer to the EJF List, which was not adopted until later. The EJF List *is* referenced in a POA brochure explaining employee rights under the ADA. However, that brochure does not reflect the terms of the MOU. Nevertheless, section 14 of the MOU, entitled "Non-Emergency Special Event Assignments," does support the proposition that special events strain Department resources. The MOU states, "This Department is frequently called upon to provide police services for one-time special events such as, but not limited to, parades, marathons, community festivals, and bicycle races. These events take place on [defendant's] streets and usually require large numbers of police officers. [¶] In order to minimize the impact on the Department's ability to provide police services at the district stations, it is necessary to utilize off-duty personnel to augment the normal complement of officers assigned for duty on the day of the event."

Finally, the evidence of the work experiences of nondisabled past and current police officers in administrative positions (§ 12926(f)(2)(F) & (G)) demonstrates that such officers periodically have been expected to perform the duties in the EJF List. As explained previously (*ante*, pt. II.B.), past and current officers in administrative positions have been required to perform those duties as circumstances have arisen requiring mass mobilization of full duty police officers. Moreover, Assistant Chief Schmitt, of the Department's Administration Bureau, testified that the full duty officers in the bureau are required to do two days of street patrol time every nine weeks. Sullivan testified that former Police Chief Fong had a policy whereby officers in administrative positions were required to walk once-monthly patrol beats.

In sum, in addition to the evidence addressed under our analysis pursuant to section 12926(f)(1)(B) (see, *ante*, pt. II.B.), the evidentiary factors outlined in section 12926(f)(2) support the trial court's finding that the duties in the EJF List are essential functions of the administrative positions plaintiff seeks. Even assuming defendant bears the burden of proving what the essential functions are, we conclude the trial court's finding is amply supported by substantial evidence in the record.

D. *The Case Authority Supports Our Essential Functions Analysis*

1. *The Decisions in* Cripe *and* Cuiellette *Are Distinguishable*

Plaintiff principally relies on the decisions in *Cripe, supra,* 261 F.3d 877 and *Cuiellette, supra,* 194 Cal.App.4th 757 to support his position that DGO 11.12 is contrary to the FEHA. Although those cases also involved police department policies regarding the accommodation of disabled police officers still capable of performing administrative work, they are materially distinguishable. Indeed, the distinctions between those cases and the present case further demonstrate why plaintiff's appeal lacks merit.

In *Cripe,* the plaintiff officers had suffered injuries which prevented them from serving as patrol officers, but, as is the case with plaintiff's condition, the injuries were "not so debilitating as to prevent them from performing any police-officer assignments at all." (*Cripe, supra,* 261 F.3d at p. 882.) The plaintiff officers in *Cripe* alleged that the City of San Jose's policies violated the ADA because the plaintiff officers were relegated to the most undesirable administrative assignments at the police department. (*Cripe,* at pp. 881–883.) In particular, the plaintiff officers were effectively excluded from desirable, nonpatrol "specialized assignments," which accounted for almost half of the department's police officer positions. (*Id.* at pp. 881–882.) The exclusion was due to the fact that officers were required to work as patrol officers in the year prior to obtaining a specialized assignment, and then were required to return to patrol duties after a limited period, usually three years. (*Id.* at pp. 882–883.) Instead, the plaintiff officers were only eligible for "highly undesirable" assignments in the "Modified Duty Pool." (*Ibid.*) "The Modified Duty Policy does not permit the City [of San Jose] to make any individual assessment as to whether an officer, with or without an accommodation, can perform the essential functions of any job other than the . . . set-aside 'modified-duty' positions. Thus, no disabled officer is eligible for any other job assignment within the [police d]epartment." (*Id.* at p. 883.) At the time the lawsuit commenced, "a total of [30] specified modified-duty positions were set aside for disabled officers." (*Id.* at p. 883.) As explained below, that fact is of critical importance in understanding why *Cripe* is distinguishable from the present case.

The trial court in *Cripe* granted summary judgment to the defendant based on its conclusion that effecting forcible arrests, controlling combative or fleeing suspects, and responding to physical threats and widespread emergencies are "essential function[s] of all specialized assignments, even though specialized assignments are not patrol-officer positions." (*Cripe, supra,* 261 F.3d at p. 884.) The Ninth Circuit Court of Appeals reversed, concluding that there was a material factual dispute whether making forcible arrests was

an essential function "of *all* the specialized-assignment positions." (*Id.* at pp. 888–889.) In particular, the court pointed out that there was a factual dispute "as to whether it is 'inevitable' that investigators, or . . . training officers, will be called upon to make forcible arrests and whether, in the case of an emergency, it is actually necessary for *all* officers to be available for patrol duty." (*Id.* at p. 888.)

The Ninth Circuit went on to explain that, because the number of disabled police officers was capped at 30, requiring that all officers in specialized assignments be able to make forcible arrests and subdue fleeing suspects could not be justified by the need for mass mobilization in the event of an emergency. The court reasoned, "given the record before us, the City[ of San Jose]'s contention that all specialized-duty and patrol officers must be capable of making forcible arrests in the event of emergencies that require the [police d]epartment to deploy all of its officers is entirely unpersuasive. The plaintiff[ officer]s do not seek to expand the number of disabled officers permitted on the force and thus, the number who would be unable to make forcible arrests should a city-wide emergency arise. Rather, they seek only the opportunity to serve in positions that are not currently designated as 'modified duty.' The City[ of San Jose] has offered no reason why the reassignment of some officers from modified-duty positions to other assignments would have an effect on the overall ability of the [police d]epartment to respond to emergencies that require a maximum response. No matter what particular assignments the [30] disabled officers may hold, there still would be the same [30] officers on the force who could not be pressed into action for the purpose of making forcible arrests, and there still would be the same number of able-bodied officers, more than [1,000], who could. The number in each category would remain constant regardless of the nature of the disabled officers' duties." (*Cripe, supra*, 261 F.3d at p. 888, fns. omitted.)[17] In contrast, in the present case the evidence demonstrated that before the adoption of DGO 11.12, the Department was accommodating approximately 210 officers in permanent light-duty assignments. Thus, the trial court here *could* find that DGO 11.12 was justified by the need to maximize the ability of the Department to respond to emergencies, while the policy in *Cripe* was not justified by that objective.[18]

---

[17] *Cripe* "offer[ed] no opinion as to whether the City[ of San Jose]'s policy limiting the number of disabled officers on the force to [30] violates the ADA or any other law." (*Cripe, supra*, 261 F.3d at p. 888, fn. 11.)

[18] It is also significant that the procedural posture in *Cripe* was very different. There, the trial court granted summary judgment to the defendant and the question on appeal was whether there was a material factual dispute on the essential functions issue. (*Cripe, supra*, 261 F.3d at pp. 888–889.) Here, the trial court found in defendant's favor after a court trial, and the question on appeal is whether that finding is supported by substantial evidence.

In *Cuiellette*, a court trial resulted in a judgment in favor of the plaintiff, a disabled officer in the Los Angeles Police Department (LAPD), on his FEHA claims. On appeal, the defendant contended the judgment was not supported by substantial evidence because the evidence showed the plaintiff was unable to perform the essential functions of a police officer, such as making a forcible arrest, with or without reasonable accommodation. (*Cuiellette, supra*, 194 Cal.App.4th at pp. 760, 768.) The plaintiff in *Cuiellette* was restricted by his doctor to administrative work. (*Id.* at p. 761.) The Second District affirmed, reasoning that, even if the plaintiff "could not perform all of the essential functions of a police officer, he could perform the essential functions of" an administrative position into which he briefly had been placed as an accommodation. (*Id.* at p. 760.) Critically, the trial court had found that, during the relevant time period, " 'the City of Los Angeles had a longstanding policy and practice of allowing sworn officers to perform "light duty" assignments that did not entail several essential functions of a peace officer such as making arrests, taking suspects into custody, and driving a police vehicle in emergency situations.' " (*Id.* at p. 762.)

Since the LAPD maintained such light-duty positions for disabled officers, the essential functions of those positions were not the same as the essential functions of a police officer in the field. Thus, *Cuiellette*, explained, "[b]ecause the LAPD maintained permanent, light-duty positions that it staffed with police officers who could not perform all of the essential duties of a police officer, the relevant inquiry is whether [the] plaintiff was able to perform the essential duties of the light-duty assignment he was given on his return to work and not whether he was able to perform all of the essential duties of a police officer in general." (*Cuiellette, supra*, 194 Cal.App.4th at p. 769.) *Cuiellette* distinguished *Raine*, which held that the City of Burbank was not required to make a disabled police officer's temporary desk assignment permanent. (*Raine, supra*, 135 Cal.App.4th at p. 1228.) In *Raine*, the plaintiff, a Burbank police officer, was placed in a front desk assignment while recovering from injuries. There was no question he could perform the functions of the position. Normally, that front desk position was staffed with civilians, not police officers, although the position was "also reserved as a temporary light-duty assignment for police officers recovering from injuries." (*Id.* at p. 1219.) The *Raine* court held the City of Burbank had no duty under the FEHA to make the plaintiff's temporary front desk assignment permanent. (*Raine*, at p. 1228.)

*Cuiellette* stated its facts were distinguishable from *Raine* "because the LAPD did not at the time in issue restrict the placement of disabled officers into *temporary* light-duty jobs." (*Cuiellette, supra*, 194 Cal.App.4th at p. 769.) Thus, *Cuiellette* supports the proposition that employers must provide accommodations into permanent light-duty assignments if such assignments exist; *Cuiellette* does not support the proposition that employers

are required to create permanent light-duty assignments to accommodate disabled employees. The present case is like Raine and unlike *Cuiellette*: Under DGO 11.12, the Department assigns disabled officers to administrative positions on a temporary basis only. Such a TMD assignment may last only up to 365 days (officers are also entitled to one year of paid leave).[19] Defendant was not obligated to make plaintiff's TMD assignment permanent, or to convert a different administrative position into a permanent light-duty position exempt from the duties in the EJF List.

### 2. *Other Case Authority Supports Our Analysis*

It is instructive to compare the present case with *Stone, supra*, 118 F.3d 92. There, the plaintiff, a disabled firefighter, sought a permanent assignment to a light-duty position in one of the fire department's specialized administrative bureaus. (*Id.* at p. 93.) *Stone* reversed a grant of summary judgment in favor of the defendant city because there were genuine issues of fact to be tried as to whether fire suppression was an essential function of those administrative positions. (*Ibid.*) On that issue, *Stone* emphasized there was "evidence that neither the past nor the incumbent firefighters assigned to those bureaus have ever been requested to engage in a fire-suppression activity." (*Id.* at p. 100.) In contrast, the record in this case is replete with evidence that past and current officers in administrative positions are periodically called upon to perform the duties in the EJF List.

Directly analogous to the present case is the decision in *Champ v. Baltimore County* (D.Md. 1995) 884 F.Supp. 991 (*Champ*). There, the court held that the disabled police officer plaintiff was not a "qualified individual" under the ADA because he could not perform the essential functions of "making a forcible arrest, driving a motor vehicle under emergency conditions and qualifying with weapons." (*Champ*, at p. 995.) The court concluded those were essential functions of the police officer position, even though there were "a couple hundred or more non-patrol positions" in the police department. (*Id.* at p. 997.) The existence of those positions did not alter the analysis because officers in those positions could be reassigned or, as in the present case, "pulled from duty to assist in emergencies." (*Ibid.*; see also *Allen v. Hamm* (D.Md., Feb. 22, 2006, No. Civ.A. RDB 05-879) 2006 WL 436054 [following *Champ*].)

---

[19] There are officers injured before the adoption of DGO 11.12 in permanent light-duty assignments, and, during an interim period after adoption of the order, the Chief of Police waived the duties in the EJF List for about 10 positions (see, *ante*, fn. 13). But those exceptions do not alter the fact that all of the vacant administrative positions at the relevant time *were* subject to the EJF List, and, unlike the situation in *Cuiellette*, it would have been contrary to departmental policy (reflected in DGO 11.12) to transform one of those positions into a permanent light-duty assignment.

Also supportive of our conclusion is the decision in *Kees v. Wallenstein* (9th Cir. 1998) 161 F.3d 1196, 1199 (*Kees*). There, the court held the plaintiff corrections officers were not qualified individuals under the ADA because their disabilities prevented them from having direct inmate contact, and such contact was an essential function of the corrections officer position. (*Kees*, at p. 1197.) The court reached that conclusion even though the plaintiffs worked in the control room, a position in which contact with inmates was not part of the regular duties. In concluding that inmate contact was nonetheless an essential function, the court reasoned that "both the employer and the written job description identify inmate contact as a fundamental duty. Although corrections officers assigned to the control room are not expected to have inmate contact on a regular basis, plaintiffs acknowledged that some incidental contact is inevitable. Further, their ability to restrain inmates during an emergency is critical to jail security. In fact, several corrections officers testified that jail safety is currently jeopardized by appellants' inability to respond to emergencies. Finally, the relevant collective bargaining agreement indicates that King County corrections officers are expected to rotate among several positions, most of which require inmate contact." (*Id.* at p. 1199; see also *Martin v. Kansas* (10th Cir. 1999) 190 F.3d 1120, 1132 (*Martin*) [relevant essential functions "were those broader functions of a corrections officer position, as opposed to the limited duties of" a specific post sought by the plaintiff], overruled on other grounds in *Board of Trustees of Univ. of Ala. v. Garrett* (2001) 531 U.S. 356, 374 [148 L.Ed.2d 866, 121 S.Ct. 955].) Similarly, the basic police duties in the EJF List are essential functions of the administrative positions at issue in this case.

Like plaintiff in the present case, the plaintiff in *Martin* asserted he was effectively subjected to a requirement that he be " '100 [percent] healed' before returning to work, which violates the ADA because the alleged policy does not allow for a required case-by-case assessment of an individual's ability to perform the essential functions of his or her job." (*Martin, supra,* 190 F.3d at pp. 1134–1135.) Like the Department, the correctional facility in *Martin* had a policy of providing temporary, but not permanent, light-duty assignments. (*Id.* at p. 1135.) *Martin* rejected the plaintiff's characterization of the policy, reasoning "the State's light duty policy is not tantamount to a '100 [percent] healed' policy or a refusal to accommodate permanent disabilities. [Citation.] As we have acknowledged previously, the ADA does not require an employer to provide permanent light duty assignments for disabled employees. At best, Martin shows only that the State's policy required him to be able to perform the essential job functions of a corrections officer, with or without accommodation. That is not a violation of the ADA; in fact it is what the ADA requires Martin to show to prove he is a 'qualified individual.' " (*Martin*, at p. 1135.) The same reasoning applies in the present case and is fatal to plaintiff's discrimination and reasonable accommodation claims.

We conclude the trial court did not err in finding that the duties in the EJF List are essential functions of the administrative positions he seeks. Because, as explained below (part II.E., *post*), plaintiff could not perform a number of those duties, he is not a qualified individual under the FEHA; the FEHA did not obligate defendant to accommodate plaintiff by excusing him from the performance of essential functions. Thus, the trial court properly rejected plaintiff's discrimination and failure to accommodate claims on the basis that he was not a qualified individual able to perform the essential functions of the positions he sought even with reasonable accommodations. In light of that holding, we need not consider whether the court erred in also accepting defendant's alternative argument that plaintiff could not perform the essential functions of the position he sought "in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." (§ 12940(a)(1).) Similarly, we need not consider defendant's contention that requiring defendant to accommodate plaintiff in a permanent light-duty administrative position would "produce undue hardship to its operation." (§ 12940, subd. (m).)

E. *Substantial Evidence Supports the Trial Court's Finding That Plaintiff Could Not Perform the Duties in the EJF List*

Plaintiff appears to argue in the alternative that he was a qualified individual even if the duties in the EJF List are essential functions of the administrative positions he seeks, based on the testimony of his medical expert that he could perform those duties "but up to a point in terms of frequency." However, that testimony was based in part on a physical examination of plaintiff that occurred sometime after the filing of his May 2008 lawsuit. Regardless of what the evidence showed regarding plaintiff's condition at some point after May 2008, in September 2007 plaintiff's cardiologist informed the Department that plaintiff "should avoid physically strenuous work and minimize physical contact," and in October 2007 the cardiologist wrote, "My opinion remains that because of his coronary heart disease he should not participate in work requiring strenuous physical activity." (See *Kaplan v. City of North Las Vegas* (9th Cir. 2003) 323 F.3d 1226, 1230 [plaintiff must be able to perform essential job functions at the time of termination].) Moreover, plaintiff's treating cardiologist testified at trial that plaintiff would be at risk of a heart attack if he were required to sprint 25 yards and that he "could be in trouble" if he had to struggle "with a suspect for two or three minutes." Substantial evidence supports the trial court's finding that plaintiff could not perform the most strenuous duties in the EJF List, even at the time of trial.[20]

---

[20] In footnote 6, *ante*, we list the eight of 11 essential functions that defendant claims plaintiff was unable to perform. We need not determine precisely which of those functions plaintiff was unable to perform. It is sufficient to sustain the trial court's judgment that the

III.  *Plaintiff's Good Faith Interactive Process Claim**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to defendant.

Jones, P. J., and Needham, J., concurred.

A petition for a rehearing was denied January 10, 2013, and appellant's petition for review by the Supreme Court was denied March 27, 2013, S208170.

---

record supports its finding that plaintiff could not perform strenuous duties, such as pursuing a suspect and forcibly arresting a suspect.
   *See footnote, *ante*, page 962.