[No. D059912. Fourth Dist., Div. One. Jan. 7, 2013.]

BRUCE FURTADO, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents.

730

**COUNSEL**

Law Office of Stephen J. Horvath, Stephen Joseph Horvath and Marc J. Berger for Plaintiff and Appellant.

Alvin Gittisriboongul for Defendants and Respondents California State Personnel Board and Suzanne Ambrose.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Assistant Attorney General, Chris A. Knudsen and Evan Richard Sorem, Deputy Attorneys General, for Defendant and Respondent California Department of Corrections and Rehabilitation.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

Bruce Furtado appeals from a judgment denying his petition for a writ of mandate directing California's State Personnel Board (SPB) to set aside its order sustaining the decision of California's Department of Corrections and Rehabilitation (the Department) to medically demote Furtado to a non-peace-officer position, and not to place Furtado in a newly created administrative correctional lieutenant peace officer position. The trial court concluded that the law and evidence supported the SPB's decision that the Department had reasonably determined that Furtado was unable to perform the essential functions of his correctional lieutenant position even with reasonable accommodation. The court further concluded that the Department acted reasonably in demoting Furtado to an available non-peace-officer position for which he was qualified and could perform the essential duties.

We affirm the trial court's judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

   1. *Furtado's background with the Department and his injury*

Furtado began working for the Department as a correctional officer in 1981. The Department promoted him to correctional sergeant in 1988, and to correctional lieutenant in 1994. As a correctional lieutenant, Furtado was classified as a peace officer, and was required to certify annually in the use of a baton.

In December 1997, Furtado was working as a correctional lieutenant at Centinela State Prison. That month, he was involved in a serious automobile accident while he was off duty. Furtado was in the hospital for 30 days and took eight months off from work to recuperate. Furtado received serious injuries to his left shoulder, forearm, elbow and hand in the accident. The injuries to the nerves in his left upper arm and his hand resulted in an overall

loss of grip strength, loss of range of motion, and difficulty in forming a fist, and caused permanent decreased functioning in his left arm and elbow.

Furtado returned to work in September 1998. At that time, Furtado's physician, Glenn Rankin, M.D., submitted a letter stating that as a result of Furtado's injuries, he could no longer perform the duties of a correctional lieutenant. In June 1999, the Department medically demoted Furtado to a non-peace-officer position of staff services analyst.

In December 2002, the Department reinstated Furtado to the position of correctional lieutenant after he obtained a medical release from his physician. The Department initially assigned Furtado to a facility within the prison. However, after a few days, the Department reassigned Furtado to perform the same job functions that he had been performing as a non-peace-officer staff services analyst because the institution staff felt that Furtado had not demonstrated that he could meet the physical qualifications of a peace officer.

After Furtado was reassigned, he was tested one on one to determine if he could qualify with a side handle baton. Department peace officers are typically tested on their weapon proficiency on a one-on-one basis after they return from a medical leave of absence. The instructor who tested Furtado concluded that Furtado had failed multiple aspects of the test. Specifically, Furtado had "no control," was "unable to lift [the] baton above [his] head," and was "unable to lift [his] arm." The instructor gave Furtado an overall rating of "Fail," and noted that Furtado had "very little control over [the] baton when both hands [were] required." In a December 2002 memorandum to the chief deputy warden of Centinela State Prison, the instructor explained that Furtado had failed his recertification with the baton because Furtado "was unable to lift his left arm above his head [as required by some of the moves] due to physical limitations," and he could not maintain adequate control of the baton with both hands as was required by certain moves.

Approximately six months later, in June 2003, the Department provided Furtado with eight hours of side handle baton training. After he received this training, Furtado was tested by a different instructor. The second instructor concluded that Furtado had failed this baton test, primarily as a result of problems with his left arm and hand. The instructor's notes demonstrated that Furtado was unable to grip the baton with his left hand and that he had no power in that hand. In a memorandum to the chief deputy warden of the prison, the instructor stated that Furtado "had a great deal of difficulty maintaining control of the Side Handle Baton whenever the techniques required the support of the weak/support hand (his left hand)." Furtado "appeared to be physically unable to complete a third of the required techniques to pass the class. He is unable to grip (wrap his fingers around the

baton) with his left hand." The instructor concluded, "[I]t is clear that he is physically unable to properly perform the techniques due to his limited mobility in his left hand, arm and shoulder."

In August 2003, before the Department had taken any action with respect to Furtado's failure to certify with the side handle baton, Furtado submitted a written request for accommodation. In his request for accommodation, Furtado stated that his physical limitations were permanent and asked that he be relieved of the requirement that he certify with the baton. Furtado also indicated that he would be amenable to being "assigned to [an] administrative position if necessary." Furtado was hoping that he would be permitted to take on "an administrative position that doesn't require the use of a baton to do some kind of lieutenant administrative duties."

Upon receiving Furtado's request for accommodation, Marvalee Brooks, Centinela's return-to-work coordinator, asked Furtado to provide a medical evaluation from his treating physician detailing his physical limitations. Dr. Rankin submitted a letter on June 17, 2003, in which he stated that Furtado's injury was permanent, that he did not anticipate that Furtado's injury would improve, and that there was no equipment that could be obtained that would assist Furtado in using the side handle baton. Dr. Rankin further stated that, as a result of the injury, Furtado had significant decreased functioning in his left arm, including his left elbow, and he had "overall loss of grip and pinc[h] strength, as well as difficulty forming a complete fist and ranging his arm through space." Dr. Rankin believed that Furtado "would have difficulty using the side handle baton . . . with the left hand."

After reviewing Dr. Rankin's letter, Brooks believed that Furtado would not be able to qualify with the side handle baton, and that there was no accommodation that would allow him to qualify with the side handle baton. Brooks further believed that because being able to meet the Department's qualification requirements with a baton was necessary in order for an employee to remain in the position of a peace officer, it would be impossible for Furtado to remain in the correctional lieutenant classification.

The Department scheduled Furtado for a "fitness-for-duty" evaluation, to be completed by William Davidson, M.D., an orthopedic surgeon who specializes in surgery of the hand and upper extremities.[1] Dr. Davidson conducted an examination of Furtado on January 19, 2004, during which he compared the injured and uninjured upper extremities and tested Furtado's range of motion. Dr. Davidson noted that Furtado had a limited range of

---

[1] At the hearing in front of the SPB, Dr. Davidson was qualified as an expert with respect to testifying about Furtado's injuries.

motion in his left shoulder, left elbow, and left wrist. For example, Furtado only had 45 degrees of motion in his left shoulder, as compared with 180 degrees of motion in his right shoulder. Furtado could not lift his left arm over his head and could lift it only halfway to the horizontal position.

The examination also revealed that Furtado was substantially limited in how far he could extend his left elbow. Normal elbow extension is 180 degrees. Furtado "could not extend or reach fully straightening [his] elbow, but could only reach to within 70 degrees." This meant that Furtado's left elbow extension was closer to a right angle than to being fully extended. In addition, Furtado's left wrist was severely compromised. Furtado had only five degrees of motion in his wrist, while an average extension would be 45 degrees. Furtado could rotate his wrist only five degrees in a clockwise motion, and was unable to turn it at all in a counterclockwise motion. An uninjured person can normally rotate both clockwise and counterclockwise 90 degrees.

Dr. Davidson's examination revealed that Furtado cannot make a fist with his left hand. With his right hand, Furtado's grip strength was 100 pounds, which is average for an adult man. Usually a person's weak side grip strength is approximately 10 percent less than his or her dominant side grip strength. However, Furtado's grip strength in his left hand was approximately 20 pounds, or about 80 percent less than his dominant hand grip strength.

Dr. Davidson was unaware of any equipment that would assist Furtado in increasing his range of motion or increasing his grip strength.

Based on this examination, Dr. Davidson concluded that Furtado was severely limited due to his injury. The limitations were permanent and rendered Furtado unable to perform a number of the duties required of correctional lieutenants. For example, Dr. Davidson was of the opinion that Furtado was impaired in his ability to disarm, subdue, or apply restraints to an inmate because those activities would require the use of both hands to grasp, hold, twist, and possibly wrest a weapon from an inmate. Dr. Davidson explained, "[W]ithout the ability of both the dominant and weak sided extremity functioning normally, there would be a profound compromise in subduing and disarming such an individual." For these reasons, Furtado also would be "profoundly compromised" in defending himself against an armed inmate. Furtado's limitations in reaching overhead and moving his left arm also would limit his ability to perform cell or body searches.

Dr. Davidson also concluded that Furtado was incapable of properly using a side handle baton, as is required of all peace officers, including correctional lieutenants. Furtado could not reach overhead, manipulate the baton, or even fully grasp the baton.

Dr. Davidson's ultimate conclusion was that Furtado "could not perform many of those functions that were listed under the essential functions of a correctional lieutenant, or those functions listed under the physical requirements in the job analysis." In Dr. Davidson's opinion, there was no way to accommodate Furtado's physical limitations to allow him to complete those functions or meet those requirements, and Furtado's health and safety would be at risk due to those limitations if he were to remain in the position of correctional lieutenant.

On January 19, 2004, Dr. Davidson sent a written report to Brooks. The report detailed the results of Dr. Davidson's examination of Furtado, including his conclusion that Furtado's physical limitations would not allow him to fully use the baton or reach overhead, and his conclusion that the weakness in Furtado's left hand would compromise Furtado's ability to perform retention and escape techniques.

The following day, Furtado submitted a one-page form from his personal physician regarding work restrictions on which the following was written: "Ok to resume full duty. No restrictions, patient can be considered permanent and stationary."

On February 18, 2004, Dr. Davidson submitted a supplemental report regarding Furtado's limitations. In this supplemental report, Dr. Davidson reiterated his opinion that due to Furtado's physical limitations, Furtado was impaired in his ability to disarm, subdue, and apply restraints to an inmate, and that he would be "compromised in his ability to defend himself against an inmate armed with a weapon."

Based on Dr. Davidson's evaluation and the fact that Furtado had failed two side handle baton tests, the Department determined that Furtado was unable to perform the essential functions of the correctional lieutenant position. Personnel manager Shantle Jones told Centinela management that in her view, Furtado's failure to qualify with the side handle baton meant that he could not qualify to be a peace officer. Patrick Cancilla, the Department's manager in charge of reasonable accommodation requests, shared this opinion. Cancilla reviewed Dr. Davidson's report and concluded that Furtado was unable to perform the essential functions of the correctional lieutenant position. Cancilla also believed that the Department could not waive the essential functions of the position, and that if it did so, it would be violating Government Code[2] section 1031, subdivision (f), which requires all public employees classified as peace officers to be found free of any physical condition that might adversely affect the exercise of peace officer powers.

---

[2] Further unspecified statutory references are to the Government Code.

Brooks briefed Centinela warden George Giurbino on Furtado's condition, and Giurbino reviewed Cancilla's memorandum regarding Dr. Davidson's conclusions about Furtado's fitness for duty.

The Department denied Furtado's request that he be allowed to work as an administrative correctional lieutenant. It determined that Furtado's request was actually a request that the Department waive one or more essential functions of the correctional lieutenant position. Brooks explained the Department's decision to Furtado in a March 27, 2004 letter: "The basis for the denial is that waiving essential functions of a job is not a reasonable accommodation, additionally, the Department of Corrections would be in violation of Government Code Section 1031[, subdivision] (f) that reads as follows: 'Each class of public officers or employees declared by law to be peace officers shall meet all of the following standards: Be found to [be] free from any physical, emotional, or mental condition which might adversely affect the exercise of the powers of a peace officer.' "

The Department continued to look for a way to place Furtado in another position in which his disability could be accommodated. The Department ultimately determined that it would have to medically demote Furtado and place him in a different position. The Department engaged in an interactive process with Furtado and offered him other positions in the Department.

Furtado was hoping to obtain a correctional counselor position. However, he did not meet the requirement of 60 semester units of college for the position. In addition, a correctional counselor is also a peace officer position, so Furtado would have had to meet the same physical requirements as for the correctional lieutenant position.

Brooks sent job opportunity bulletins to Furtado until he told her to stop sending them to him because he had access to them on his own. Furtado applied for two lieutenant positions at fire camps. Furtado believed that he had been given a full and fair opportunity to interview for those positions despite the fact that he was not selected to fill either job opening.

In March 2004, Furtado wrote to Brooks saying that he was prepared "to accept a reasonable offer as an Associate Government Program Analyst." Brooks looked for Associate Government Program Analyst positions in the area and forwarded the job opportunity bulletins to Furtado so that he could apply.

Furtado accepted an Associate Government Program Analyst position at the California Institute for Men. The position was one of the highest paying non-peace-officer positions available at the Department. After Furtado accepted this position, on November 20, 2004, the Department medically

demoted him to the Associate Government Program Analyst position, effective December 2004. Furtado began working in that position as of December 2004.

## 2. The evidence presented regarding the role of a correctional lieutenant

A correctional lieutenant employed by the Department is a sworn peace officer. The Department requires each correctional lieutenant to be able to perform the full range of duties associated with all of the various correctional lieutenant assignments because a particular correctional lieutenant may be assigned to a variety of posts or be required to do different work at different posts. The Department often has to move a correctional lieutenant from one post to another. For instance, a correctional lieutenant assigned to one post may be required to report to another area because there is a greater need in the other area. Thus, a correctional lieutenant who usually works on administrative matters could at some point be required to report to one of the yards and have contact with inmates.

The Department's documents demonstrate that all correctional lieutenants are expected to be able to perform peace officer duties. All peace officers who work for the Department, including all correctional lieutenants, must be able to "[d]isarm, subdue and apply restraints to an inmate," and "[d]efend [themselves] against an inmate armed with a weapon." In addition, correctional lieutenants may be called upon to search a cell, including top and bottom bunks, and therefore, must be able to "[r]each overhead while performing cell or body searches."

Among the qualifications for a correctional lieutenant that the Department identified is "the ability to maneuver [a] baton with both dominant and weak side." A correctional lieutenant "[m]ust qualify with the baton having the ability to move/use both hands, wrists and arms independently of each other." The Department's operations manual (DOM) requires that all correctional lieutenants qualify with the baton annually.

It is important that correctional lieutenants be able to perform all of the physical duties expected of their subordinate peace officers. As supervisors, correctional lieutenants may be required to assist and support correctional sergeants and correctional officers in providing security, and may have to train another officer to perform these duties.

Because prisons are volatile environments where there are fights between inmates, assaults and sometimes riots, it is important that a correctional lieutenant be capable of using nonlethal weapons to disarm or subdue an

inmate or to defend himself or herself. When there are fights, disturbances, escapes or riots, correctional lieutenants are required to assist other staff. Because a correctional lieutenant is a peace officer who may come into contact with inmates at any time, it is important that he or she be able to use force and nonlethal weapons in order to subdue a resisting inmate. A correctional lieutenant working in a prison who is physically unable to disarm, subdue or place restraints on an inmate would be a hazard to himself or herself and to others because that inability would leave other employees in the area to deal with the situation without the assistance of that correctional lieutenant.

Warden Giurbino views the ability to use a side handle baton to be essential for anyone who works as a correctional lieutenant. He explained:

"I would view that a peace officer, again, whether it be a correctional lieutenant, sergeant, or officer position[,] has specific tools that they have available with them on duty within the correctional environment and I view that each one of those tools is essential in order for them to complete their job.

"The prison is a very volatile workplace where we have homicides . . . take place, we have riots that take place, we have specific confrontations where inmates become immediately aggressive and staff are unable to use perhaps their oleoresin capsicum spray that may be attached to their belt, however, they're able to use their baton in order to defend themselves or to defend others. [¶] . . . [¶]

"There are some areas of our institutions that don't have weapons close (inaudible) directly adjacent to them. We have had some incidents where we have inmates walk up directly behind supervisors and start stabbing them immediately without any known origin or cause for the attack and without having some tools and weaponry available, it would make it very difficult for them and others to defend inmates and staff within our institutional setting."

## B. *Procedural background*

Furtado filed an appeal to the SPB, contending that the Department had acted discriminatorily (1) in denying him reasonable accommodation for his disability, and (2) in medically demoting him. The SPB held a nine-day evidentiary hearing and considered the testimony of multiple witnesses and documents. Upon the conclusion of the hearing, the SPB denied Furtado's appeal. The SPB concluded:

"1. The Respondent was not required to reasonably accommodate the Appellant because the Appellant was not qualified for the Correctional Lieutenant position.

"2. The Respondent properly medically demoted the Appellant to the position of Associate Governmental Program Analyst."

In reaching these ultimate conclusions, the SPB determined that Furtado failed to meet the minimum requirements of the job of correctional lieutenant because he could not qualify to use a side handle baton, which the Department had determined was a requirement for all correctional lieutenants. In addition, the evidence demonstrated that after Furtado's accident, he was no longer able to "complete the essential functions of a Peace Officer position (e.g. the ability to disarm, subdue, and apply restraints to an inmate; the ability to defend himself against an inmate armed with a weapon; the ability to reach overhead while performing cell or body searches)." Furtado filed a petition for writ of mandate with the superior court, challenging the SPB's decision. The trial court denied Furtado's petition for a writ of mandate. In denying the petition, the trial court stated:

"[T]his court agrees with the hearing officer's implicit finding that the position of correctional lieutenant requires qualification with a baton. Modification of the position's requirements to delete that requirement of qualification with a baton would fundamentally alter the nature of the position. This court finds that one of the necessary functions of a safety officer is to be able to respond to life-threatening situations, however rare. In the context of a prison setting, the potential need for uniformed correctional staff to physically control inmates is implicit. Although a particular staff member may rarely interact with prisoners in this manner, the need to be able to use force to restrain the prisoners in rare but dangerous situations remains, as the result of the failure to restrain them may harm the life or health of other inmates or staff.

"Inasmuch as petitioner could not meet the qualifications of the position requiring him to use a specific non-lethal weapon, he could not perform the essential duties of a correctional lieutenant. It was undisputed that there was no accommodation that would allow petitioner to qualify with the baton."

Furtado filed a timely notice of appeal.

III.

DISCUSSION

Furtado's claims against the Department are that it failed to reasonably accommodate his disability as he requested, and that it engaged in unlawful discrimination in medically demoting him to the non-peace-officer position of Associate Governmental Program Analyst. Both of Furtado's claims go to the

same issue—i.e., whether Furtado is able to perform the essential functions of the peace officer position of correctional lieutenant, with or without accommodation.

## A. Standards applicable to review from an SPB decision

Trial court review of an administrative decision is governed by Code of Civil Procedure section 1094.5. Subdivision (b) of section 1094.5 limits the extent of the reviewing court's inquiry "to the questions whether the [administrative tribunal] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." In determining whether there was an abuse of discretion, the reviewing court may consider whether the administrative tribunal proceeded in the manner required by law, whether its order or decision is supported by the findings, and whether the findings are supported by the evidence. (*Ibid.*)

Because the SPB has been endowed with quasi-judicial powers, the trial court may not exercise its independent judgment, but must uphold the findings if they are supported by substantial evidence. (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 [278 Cal.Rptr. 346, 805 P.2d 300].) In applying the substantial evidence test to such a decision, a court must examine all relevant evidence in the entire record, considering both the evidence that supports the board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335 [25 Cal.Rptr.2d 842].) This does not mean, however, that a court is to reweigh the evidence. Rather, all presumptions are indulged and conflicts resolved in favor of the board's decision. (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584 [128 Cal.Rptr.2d 514].)

These standards do not change on appellate review from a trial court's denial of a petition for writ of mandate from a decision of the SPB; an appellate court independently determines whether substantial evidence supports *the SPB's findings*, not the trial court's conclusions. (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701 [62 Cal.Rptr.2d 775]; see *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632 [29 Cal.Rptr.2d 191].) "We do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the board's decision." (*Camarena v. State Personnel Bd., supra,* at p. 701.) However, insofar as an appeal from an administrative mandamus proceeding presents questions of law, our review is de novo. (*Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404 [107 Cal.Rptr.2d 39].)

B.  *Legal standards related to California Fair Employment and Housing Act claims*

  1.  *Overview of FEHA relevant to Furtado's case*

■  The California Fair Employment and Housing Act (FEHA; § 12900 et seq.) makes it an unlawful employment practice to discharge a person from employment or to discriminate against the person in the terms, conditions, ·or privileges of employment, because of physical or mental disability or medical condition. (§ 12940, subd. (a).)[3] However, FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, *is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.*" (§ 12940, subd. (a)(1).)

The essential functions of a position are "the fundamental job duties of the employment position the individual with a disability holds or desires." (§ 12926, subd. (f).) FEHA lists the evidence that may be considered in determining the essential functions of a job. This "includes, but is not limited to . . . [¶] [t]he employer's judgment as to which functions are essential . . . [and w]ritten job descriptions prepared before advertising or interviewing applicants for the job." (§ 12926, subd. (f)(2)(A) & (B).)[4]

With respect to the requirement that an employer make reasonable accommodation(s) for a disabled employee, FEHA provides: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m).) An employer is not required to make an

---

[3] There is no dispute in this case that Furtado suffers from a physical disability.

[4] Section 12926, subdivision (f)(2) states in full:

"(2) Evidence of whether a particular function is essential includes, but is not limited to, the following:

"(A) The employer's judgment as to which functions are essential.

"(B) Written job descriptions prepared before advertising or interviewing applicants for the job.

"(C) The amount of time spent on the job performing the function.

"(D) The consequences of not requiring the incumbent to perform the function.

"(E) The terms of a collective bargaining agreement.

"(F) The work experiences of past incumbents in the job.

"(G) The current work experience of incumbents in similar jobs."

accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation." (*Ibid.*)

### 2. Claims for discrimination and failure to accommodate under FEHA

Because Furtado's petition for writ of administrative mandamus with respect to the SPB's decision touches on the questions of reasonable accommodation and discrimination under FEHA, we set forth the elements of both types of claims, in order to provide structure and context for considering whether the findings of the SPB may be affirmed.

■ To establish a prima facie case of physical disability discrimination under FEHA, the employee must demonstrate that he or she is disabled, is otherwise qualified to do the job, and was subjected to an adverse employment action because of such disability. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432, fn. 2 [60 Cal.Rptr.3d 359]; *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886 [58 Cal.Rptr.3d 729].) The employee must establish that he or she is a "qualified individual," i.e., an employee who can perform the essential functions of the job with or without reasonable accommodation. (*Green v. State of California* (2007) 42 Cal.4th 254, 260–261 [64 Cal.Rptr.3d 390, 165 P.3d 118].) If the employee meets this burden, it is then incumbent on the employer to show that it had a legitimate, nondiscriminatory reason for its employment decision. (*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44 [90 Cal.Rptr.2d 15].) When this showing is made, the burden shifts back to the employee to produce substantial evidence that employer's given reason was either "untrue or pretextual," or that the employer acted with discriminatory animus, in order to raise an inference of discrimination. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005 [67 Cal.Rptr.2d 483].)

■ The essential elements of a claim of failure to accommodate are: (1) the plaintiff has a disability covered by FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 255–256 [102 Cal.Rptr.2d 55] (*Jensen*).) "The elements of a failure to accommodate claim are similar to the elements of a . . . section 12940, subdivision (a) discrimination claim, but there are important differences. The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. For purposes of [a failure to accommodate] claim, the plaintiff proves he or she is a qualified

individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position. [Citations.] More significantly, the third element [under a subdivision (a) claim] . . . establishing that an 'adverse employment action' was caused by the employee's disability—is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself. [Citation.]" (*Jensen, supra*, at p. 256.)

■ Under FEHA, "reasonable accommodation" means "a modification or adjustment to the workplace *that enables the employee to perform the essential functions of the job held or desired.*" (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974 [83 Cal.Rptr.3d 190], italics added.) " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (§ 12926, subd. (*o*); see Cal. Code Regs., tit. 2, § 7293.9, subd. (a); accord, 42 U.S.C. § 12111(9).)

■ "If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an employer must make affirmative efforts to determine whether a position is available. [Citation.] A reassignment, however, is not required if 'there is no vacant position for which the employee is qualified.' [Citations.] 'The responsibility to reassign a disabled employee who cannot otherwise be accommodated does "not require creating a new job, moving another employee, promoting the disabled employee or violating another employee's rights . . . ." ' [Citations.] 'What is required is the "duty to reassign a disabled employee if an already funded, vacant position at the same level exists." [Citations.]' [Citations.]" (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1223 [37 Cal.Rptr.3d 899], italics omitted (*Raine*); see § 12926, subd. (*o*).)

C. *Furtado has not demonstrated an abuse of discretion in the SPB's decision*

  1. *The SPB's determination that Furtado was not denied reasonable accommodation is supported by substantial evidence*

      a. *Substantial evidence supports the finding that Furtado could not perform the essential functions of the correctional lieutenant position*

          (i.) *The evidence supports the SPB's finding that being able to effectively defend oneself and others, and being able to disarm, subdue and apply restraints to an inmate, are essential functions of the correctional lieutenant position*

The SPB found that being able to disarm, subdue, and apply restraints to an inmate, and being able to defend oneself against an armed inmate, are essential functions of the correctional lieutenant position. This finding is clearly supported by substantial evidence.

The essential functions of a particular position are "the fundamental job duties of the employment position the individual with a disability holds or desires." (§ 12926, subd. (f).) According to FEHA, a fact finder may consider, but is not limited to, the following evidence when determining whether a function is essential: "The employer's judgment as to which functions are essential"; "Written job descriptions prepared before advertising or interviewing applicants for the job"; "The amount of time spent on the job performing the function"; "The consequences of not requiring the incumbent to perform the function"; "The terms of a collective bargaining agreement"; "The work experiences of past incumbents in the job"; and "The current work experience of incumbents in similar jobs." (§ 12926, subd. (f)(2).)

Written job analysis of the position of correctional lieutenant, as well as testamentary evidence, established that the Department views the ability to disarm, subdue, and apply restraints to an inmate and to defend oneself against an armed inmate to be essential functions of all peace officers employed by the Department.[5] Gonzalez, who had served as an associate warden of central services for the Department, testified that the Department uses a document that lists the essential functions required of all peace officers

---

[5] There is no dispute that correctional lieutenants are peace officers. Section 1031, subdivision (f) requires that all peace officers "[b]e found to be free from any physical, emotional, or mental condition that might adversely affect the exercise of the powers of a peace officer."

employed the by the Department so that it can "identify[] those who can function as a peace officer." Gonzalez referred to this document in determining what the requirements and essential functions of a peace officer are. Disarming, subduing and applying strength to an inmate are essential functions of the job of being a peace officer in a correctional facility because there are "riots and fights and incidents within the institution where inmates are—have stabbed and we have to rush in and subdue the inmate, sometimes multiple inmates, sometimes two inmates, but we get in there and we assist in making sure that everybody is handcuffed and down before we can raise the yard or pick everybody up and escort them."

In addition, it is important for correctional lieutenants to be able to perform the functions of disarming, subduing and restraining an inmate because "at times we [(i.e. supervisory peace officers, such as correctional lieutenants)] are called to also enter the incident, depending on how many staff you have." Gonzalez explained, "Even now, as an associate warden, I also have gotten in and had to subdue some inmates in hallways and dorms."

Similarly, it is an essential function of a peace officer to be able to defend oneself against an armed inmate because peace officers are called on to defend themselves and others, and have to come to the aid of coworkers when there are incidents at an institution. All peace officers who work in a prison must be able to defend themselves against armed inmates for the safety of everyone—employees and inmates—who are in the institution.

Correctional lieutenants, in particular, must all be able to defend themselves and disarm, subdue, or restrain an inmate. Gonzalez explained that correctional lieutenants must be able to do these things "[b]ecause incidents that occur, . . . escapes and inmate behavior, conduct, disturbances and these are things that depending on the institution, depending on the time of the year, a lot of this picks up. There's times where there's incidents on the yard, riots that we [supervisors] have to go out and assist. We have officers that are tied up with escorts and we have nobody else to escort, so a sergeant or a lieutenant may end up escorting, which means there's a protocol where you have to use your PR24 [baton]. It has to be out and be ready for use in case the inmate tries to turn on you. There's different functions that a correctional officer would normally do, but at times because we have something going on, it requires supervisors to be present and also be able to assist." (See *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 974–976 [150 Cal.Rptr.3d 385] (*Lui*) [even officers primarily assigned to administrative duties may be required to perform more strenuous duties when necessary, thus, those strenuous duties are essential functions of the job].)

In addition, correctional lieutenants are responsible for knowing what the employees they supervise are doing, and for making sure that those things are

being done properly. Correctional lieutenants may be assigned to a variety of posts, as well, so they must be able to perform the duties and complete the requirements of all of the correctional lieutenant posts in the institution. Correctional lieutenants not only have to know what the various duties of different posts are, but they also may be called upon to teach those duties to others at different points in time.

A written document, entitled "Correctional Lieutenant Job Analysis," dated August 26, 2003, was used by the Department to set forth the requirements and standards required of correctional lieutenants. This document indicates that the Department requires correctional lieutenants to know and be able to perform the duties at the various different posts at an institution.

Giurbino testified that at some point prior to being appointed to the position of warden at Centinela State Prison, he had held the position of correctional lieutenant in a correctional facility for approximately five or six years and was familiar with the requirements and functions of the correctional lieutenant position. According to Giurbino, it is important for correctional lieutenants to be able to defendant themselves and others because homicides and riots take place in the prison environment. Inmates sometimes suddenly become aggressive, and supervisors sometimes are attacked and stabbed.

A correctional lieutenant who is unable to disarm, subdue, or apply restraints to an inmate "would be a hazard to others. . . . [I]f there was an incident occurring that he was not able to respond to, it would leave any other employee in the area to have a situation by themselves. He wouldn't be proficient assisting others as a peace officer is supposed to be. It would be a danger to others."

All of this testimony constitutes substantial evidence to support the SPB's finding that both the ability to defend oneself against an armed inmate, and the ability to disarm, subdue, and/or restrain an inmate, are essential functions of the correctional lieutenant position at the Department.

### (ii.) *Being proficient with a baton is a reasonable requirement of the position of correctional lieutenant*

Furtado contends that being able to satisfactorily use a baton is not actually an essential function of the correctional lieutenant position, and, therefore, the Department should have accommodated him by not requiring him to recertify with the baton. He argues that the relevance of the baton certification testing is "largely fictional and artificial." The baton certification testing is the method by which the Department determines whether an employee is capable of using the baton. The evidence demonstrates that using a baton in a prison

facility is in fact a significant requirement of the job because it is one of the methods that prison staff, including correctional lieutenants, use to defend themselves against armed inmates, and to disarm, subdue and apply restraints to inmates, which are essential functions of the position.

Warden Giurbino, Associate Warden Gonzalez and Patrick Cancilla, a Staff Services Manager I who reviewed employee disability accommodation requests, all testified that qualifying with a side handle baton is a requirement for the correctional lieutenant position. They explained that correctional lieutenants may have to assist other officers at any point in time, and may come into contact with prisoners. Correctional lieutenants therefore must be prepared to deal with fights, disturbances, escapes or even riots. Correctional lieutenants, like other peace officers in the prison, must be able to use the side handle baton, a nonlethal weapon, to disarm or subdue inmates and/or defend themselves against armed inmates.

In the document in which the Department listed what it perceives to be the essential functions of the correctional lieutenant position, the Department indicated that a correctional lieutenant must be able to "qualify with the baton having the ability to move/use both hands, wrists and arms independently of each other." The requirement that a correctional lieutenant qualify with a baton is listed under the same "peace officer dut[y]" that requires a correctional lieutenant to be able to use both hands and a baton to be able to restrain an inmate. Correctional lieutenants are required to qualify annually in the use of a baton. If a correctional lieutenant were not required to qualify annually with the baton, that employee would not be able to train his or her staff "on the right and wrong ways of utilizing the weaponry that's assigned to [peace officers in the institution]," and this would cause a "domino effect" whereby peace officers would not "have to do what they are supposed to do, what they signed up for."

Gonzalez testified that his understanding is that having all peace officers trained to use a baton, certified to do so, and carrying batons deters inmate violence. Having all staff trained and qualified to use the baton "assists the staff in doing our job, escorts and otherwise responding. And yes, I do believe it deters the violence within the institution. I believe this because I have been a PR24[6] instructor when I was a correctional officer, correctional sergeant and correctional lieutenant. I was also on the line before we carried PR24s, before PR24s actually came into effect in the Department of Corrections and have noticed the difference since."

---

[6] Although not defined by Gonzalez, it is apparent from context that he is referring to a baton when he uses the term "PR24." In addition, a different witness definitively identified the "PR24" as a side handle baton.

> (iii.) *There is substantial evidence to support the finding that Furtado could not perform all of the essential functions of the position of correctional lieutenant, with or without accommodation*

There is substantial evidence to support the SPB's finding that Furtado is unable to perform the essential functions of his position as correctional lieutenant, and that there is no accommodation that would enable him to do so.

The evidence from the medical providers established that Furtado's limited functioning with his left arm and hand is permanent. His limited range of motion in that arm, limited strength, and limited grip strength all contributed to his inability to certify with the side handle baton. This, in turn, would leave him vulnerable to attack from an armed inmate and unable to disarm, subdue or restrain an inmate. Furtado twice failed to qualify with the baton. One instructor testified that Furtado could not raise his left hand over his head, which prevented him from completing some basic moves with the baton, such as an overhead block or a power chop. Furtado also was unable to swing the baton with any force with his left hand. Another instructor testified that Furtado was also unable to complete the baton techniques that required significant use of his weak-side hand. Furtado was unable to even grip the baton with his left hand. Furtado's own physician concluded that Furtado could use the baton "with the left hand only with great difficulty." In addition, Dr. Davidson reported that Furtado's limited functioning with his left extremity rendered him incapable of satisfactorily using the baton. The evidence also demonstrated that no one, not even Furtado, could envision an accommodation or other equipment that would enable him to satisfactorily use the side handle baton.

Even aside from his inability to use the baton, there was evidence that Furtado was not otherwise able to disarm, subdue or restrain an inmate, particularly an armed inmate. Dr. Davidson was of the opinion that Furtado's limited motion and significantly impaired grip strength meant that he would be "profoundly compromised" in defending himself against an armed inmate. In addition, he would have much difficulty restraining an inmate because doing so would require strength in both arms, the ability to manipulate one's hand, and an adequate range of motion, none of which Furtado possessed.

The evidence overwhelmingly supports the SPB's determination that as a result of the limitations of Furtado's use of his left arm, elbow and hand, Furtado is unable to perform the essential functions of a peace officer position within the Department, including the correctional lieutenant position.

b. *Reassignment to an "administrative" correctional lieutenant position would not constitute "accommodation," but instead, would excuse Furtado from performing all of the essential functions of that position*

Throughout this process, Furtado has argued that in requesting that he be placed in a position of administrative correctional lieutenant, he was not asking the Department to create a job for him, but rather, was simply asking for a slight modification of a requirement of his position that was really relatively unimportant. However, as we have explained, there was abundant evidence from which the SPB could conclude that being able to proficiently use the baton to defend against an aggressive inmate or to subdue and restrain an inmate is a requirement for every peace officer working in a correctional institution because the potential risk of being unable to use a nonlethal weapon to defend against attack or subdue an inmate is so great.

Furtado also contends that there are alternative correctional lieutenant positions in which a particular assignment would not, as a matter of course, require a correctional lieutenant to carry a baton. He argues that he should have been "accommodated" by being placed in a correctional lieutenant position that was more "administrative" in nature and did not require the use of a baton. However, the evidence established that even if there are correctional lieutenant positions in which the employee is not called upon to use a baton on a regular basis, the nature of peace officer work in a prison setting is such that each and every correctional lieutenant may at some point be called upon to have to use a baton to defend himself or to restrain an inmate. The Department put forth ample evidence to demonstrate that all correctional lieutenants are required to be able to properly use a baton, as well as the reasons for such a requirement—i.e., so that they can perform the essential functions of defending themselves against an armed inmate and assisting in disarming, subduing and/or restraining an inmate. The Department also put forth evidence as to why it is important for *all* correctional lieutenants to be able to perform these functions.

Again, the Department's documents and testimonial evidence provided at the SPB hearing established that it is important for all correctional lieutenants to be able to perform all of the essential functions of the job, even those functions that may not typically be required of a particular individual in a particular assignment because the needs of the institution are such that employees may be asked to take on different roles. (See *Lui, supra,* 211 Cal.App.4th at pp. 974–979 [functions may be essential, even if not typically required of all officers, because they may be necessary to perform when mobilization of entire force is required].) In the "Correctional Lieutenant Job Analysis" document, the Department explains, "Correctional lieutenants may

be assigned to a variety of posts or positions and do work which varies from one post to another. It is essential that a correctional lieutenant be able to perform the full range of duties which may be required of a[] correctional lieutenant post or position." One of these duties is identified as "assist[ing] and support[ing] correctional sergeants and correctional officers in providing security to inmates in correctional institution in accordance with established policies, regulation and procedures, and observe conduct and behavior of inmates to prevent disturbances and escapes." Other duties include "provid-[ing] security and direct[ing] inmates during work assignments"; "employ-[ing] weapons or force to maintain discipline and order among prisoners when necessary"; "provid[ing] security to entrances to the prison, screen[ing] visitors and supervis[ing] visiting locations"; "escort[ing] inmates to and from visiting rooms, medical offices and religious services"; and being "involved in the transportation of inmates between the institutions and outside medical care, court rooms, etc."

A correctional lieutenant must be able to perform the full range of duties, not just the ones to which he or she is typically assigned, because "there may be a greater need for the institution to place [a correctional lieutenant] somewhere else, either based on a vacancy or a sick call." There may be times where a correctional lieutenant is "required to report to another area that is in greater need, whether it be because of a modified program, because of a lockdown, some inmates aren't cooperating." Thus, at any point in time, a correctional lieutenant may be called to assist in a situation involving direct contact with inmates in which that correctional lieutenant may be required to defend himself or others, or may be required to subdue or a restrain an inmate. A correctional lieutenant who is limited in his ability to perform these tasks would place a burden on the other peace officer employees at the institution—either he could not be used for such functions and thus there would be one less peace officer available to provide security, or, if he were assigned to such duties, his presence would place the safety of himself and others at risk. The evidence presented at the SPB hearing established that although most correctional lieutenants are not normally called upon to use a baton in their day-to-day activities, their ability to use one in those times when it is necessary could be the difference between maintaining order and safety in the institution and not being able to do so.

The accommodation that Furtado seeks from the Department here (either a waiver of the baton certification requirement, or assignment to an "adminis-trative" correctional lieutenant position) is similar to the "accommodation" that the plaintiff in *Raine, supra,* 135 Cal.App.4th at pages 1223–1224, sought. In *Raine,* the employee, Raine, had been a police officer for 21 years. In his most recent position as a school resource officer, he was required to patrol school campuses when school was in session, and to work as a street patrol officer when school was not in session. After suffering an injury while

on duty, he had difficulty running, jumping, kneeling and lifting—activities that he conceded were essential to performing the duties of a patrol officer and school resource officer. Raine was reassigned to a temporary light duty position at the department's front desk until his injury healed. His physician ultimately determined that his injury was permanent and that he would never be able to perform the essential functions of a patrol officer. After engaging in the interactive process mandated by FEHA, the Department determined that it had no positions for a sworn officer with Raine's physical limitations, and Raine took disability retirement. Raine subsequently brought suit, maintaining that the Department was required to accommodate him by placing him permanently in the front desk position. In holding for the Department, the *Raine* court concluded that the plaintiff was essentially seeking to reclassify the front desk position from a civilian position to a sworn officer position. (*Raine, supra,* at pp. 1223–1224.) In effect, the plaintiff in *Raine* wanted "a new position that retains the benefits afforded to sworn officers but without the attendant essential functions of the sworn-officer position." (*Id.* at p. 1228.) The court determined that the Department was not required to create a new position for the employee—one that would allow him to retain the status of patrol officer—as an accommodation.

As in *Raine*, Furtado requested that the Department "accommodate" his disability by either waiving the requirement that he certify with the side handle baton, or assigning him to an "administrative" correctional lieutenant position. Furtado was not entitled to either of these "accommodations." Waiving the baton certification requirement would mean that Furtado would not have to demonstrate that he is a "qualified individual" within the meaning of FEHA. Instead, it would allow Furtado to continue as a correctional lieutenant while being unable to perform all of the essential functions of the position. Further, because the evidence demonstrates that there is no purely "administrative" correctional lieutenant position whereby no prisoner contact can be ensured, the Department would have to create a new "administrative" position that does not currently exist. Because there is substantial evidence to support the finding that Furtado is unable to perform all of the essential functions of a correctional lieutenant, the Department was not required to maintain him as a correctional lieutenant while placing him in a primarily administrative role. Furtado's request that the Department essentially waive an essential function of a position is not a "reasonable accommodation."

Furtado also contends that the *trial court* erred in relying on *Quinn v. City of Los Angeles* (2000) 84 Cal.App.4th 472 [100 Cal.Rptr.2d 914] (*Quinn*), in denying his petition for a writ of mandate.[7] However, as we have already indicated in setting out the standards we apply on an appeal from a denial of a petition for administrative mandamus from an SPB decision, we do not

---

[7] Elsewhere, Furtado also appears to complain that the SPB relied on *Quinn, supra,* 84 Cal.App.4th 472.

review the trial court's findings or legal reasoning, but, rather, the determination of the SPB. Therefore, it is of no consequence whether the trial court correctly or incorrectly relied on *Quinn*. What is of consequence is whether Furtado has demonstrated that the SPB abused its discretion in upholding the Department's decision not to place Furtado in a so-called "administrative" correctional lieutenant position and to instead medically demote him to a non-peace-officer position.

Nevertheless, Furtado's challenge to the application of *Quinn* to his case is meritless. *Quinn* involved a plaintiff who applied to be a Los Angeles City police officer. (*Quinn, supra*, 84 Cal.App.4th at p. 475.) Quinn had failed the medical exam because of a significant hearing impairment, but as a result of a clerical error, he was notified to report for further tests. Quinn eventually passed the other tests and was admitted to and graduated from the police academy. He became a police officer and was assigned to patrol duty. While on probation in this position, Quinn's hearing problem manifested itself in several ways, and he was assigned to desk duty. After another hearing exam revealed his hearing impairment, the Los Angeles Police Department terminated him. Quinn sued the City of Los Angeles, alleging disability discrimination in violation of FEHA. (*Quinn, supra*, at p. 475.)

After a jury found in favor of the plaintiff, the *Quinn* court concluded that the trial court should have directed a verdict in favor of the City of Los Angeles on Quinn's claim. (*Quinn, supra*, 84 Cal.App.4th at pp. 475–476.) According to the appellate court, the plaintiff was required to show that he was qualified to be hired as a police officer, and he failed to do so. (*Id.* at p. 480.) The *Quinn* court explained, "Recent decisional law is replete with the statement that in order to establish a prima facie case for discrimination based upon violation of the FEHA, the plaintiff must prove he was qualified for the position." (*Ibid.*)

In determining that the case before it involved an individual "who was never qualified to be hired from the outset" (*Quinn, supra*, 84 Cal.App.4th at p. 483), the *Quinn* court explicitly discussed why an employer may not be liable *for failing to hire or for discharging* an employee who does not meet the requirements set forth for the position: "While Government Code section 12940 provides that '[i]t shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, . . . [¶] [f]or an employer, because of the . . . physical disability . . . of any person, . . . to discharge the person from employment . . . ,' subdivision (a)(2) to that section expressly creates an exception to that liability-creating rule by providing: 'This part does not prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform his or her essential duties even with reasonable accommodations, or

cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform his or her essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.' " (*Quinn, supra*, 84 Cal.App.4th at p. 482, fn. 5.)

Furtado argues that *Quinn* applies only to a situation in which an individual is an applicant for a position, and not to a situation like his that involves a previously qualified employee who subsequently becomes disabled. Furtado suggests that there is a distinction between meeting the "initial qualifications" for a job and meeting the "essential functions of the job," and contends that the SPB and the trial court erred in applying *Quinn* because that case pertains only to a job applicant who is unable to meet the initial qualifications of a position. In making this argument, Furtado assumes that the standards by which one determines whether a disabled applicant can meet the initial qualifications of a position are different from the standards that apply to an employee who has already met the initial qualifications and is later disabled and seeks reasonable accommodation for that disability.

■ What Furtado fails to understand is that an employee who becomes disabled during employment and, as a result, is unable to perform one or more essential functions of his or her job is essentially in the same position, for purposes of FEHA, as an applicant who does not qualify for the job because he or she cannot perform the one or more of the essential functions of that job as a result of a disability. It is clear that an individual who brings a FEHA claim must establish that he or she is qualified for the position at issue. For purposes of an alleged failure to reasonably accommodate a disability, a "plaintiff proves he or she is a *qualified* individual by establishing that he or she *can perform the essential functions of the position* to which reassignment is sought, rather than the essential functions of the existing position." (*Jensen, supra*, 85 Cal.App.4th at p. 256, italics added; see *Raine, supra*, 135 Cal.App.4th at p. 1223, fn. 5.) This applies equally to an applicant for a position and to a person who has been employed in the position. (See § 12926, subd. (f) [the essential functions of a position are "the fundamental job duties of the employment position the individual with a disability *holds or desires*" (italics added) indicating the same standards apply to those seeking a position and those already in the position].) The SPB's citation to *Quinn* does not mean that the SPB failed to address the question relevant to Furtado's appeal—i.e., whether Furtado is able to perform the essential functions of the correctional lieutenant position (or any other peace officer position).

*2. There is substantial evidence to support the SPB's conclusion that the Department's medical demotion of Furtado was proper*

█ The Government Code authorizes a state agency to medically demote an employee who is unable to perform the essential functions of his position but who is able to perform the functions of a different position. (§ 19253.5.)

The agency may require an employee to submit to a medical examination by a physician to evaluate the employee's ability to perform the work of his or her position. (§ 19253.5, subd. (a).) After considering the results of the examination and other pertinent information, if the agency concludes that the employee cannot perform the work of his or her current position, the agency may demote the employee to a position that he or she is able to perform. (§ 19253.5, subd. (c); see *Gonzalez v. Department of Corrections & Rehabilitation* (2011) 195 Cal.App.4th 89, 92 [123 Cal.Rptr.3d 849] [correctional officer whose permanent knee injury rendered him unable to perform activities including "take-downs" medically demoted to office assistant].)[8]

The SPB determined that the Department's decision to medically demote Furtado to the non-peace-officer position of Associate Government Program Analyst was proper. The SPB's determination is clearly supported by substantial evidence. The Department asked Dr. Davidson to conduct a fitness-for-duty examination after Furtado failed to requalify with the baton twice, and after receiving a letter from Furtado's physician indicating that his physical impairment was permanent and that he could use the side handle baton with his left hand and arm only with difficulty. Dr. Davidson was of the opinion that as a result of Furtado's physical impairment, he was unable to perform a number of the duties required of his position as a correctional lieutenant. For example, Dr. Davidson concluded that Furtado would be

---

[8] Section 19253.5 provides in pertinent part:

"(a) In accordance with board rule, the appointing power [(i.e., the Department)] may require an employee to submit to a medical examination by a physician or physicians designated by the appointing power to evaluate the capacity of the employee to perform the work of his or her position. [¶] . . . [¶]

"(c) When the appointing power, after considering the conclusions of the medical examination and other pertinent information, concludes that the employee is unable to perform the

incapable of properly using a side handle baton, and would be compromised in disarming, subduing, or restraining an inmate, would be compromised in defending himself against an armed inmate, and would be unable to reach above his head to perform a search. After reviewing the duty statement and essential functions of the correctional lieutenant position, Dr. Davidson stated the following in his supplemental report: "Because of the restrictions that I have already discussed in reference to the weak left upper extremity, I am of the opinion that Mr. Furtad[o] is impaired from unrestrained duties to disarm, subdue, and apply restraints to an inmate. I am of the opinion that he is compromised in his ability to defend himself against an inmate armed with a weapon. He has no restrictions in his ability to run or to climb occasionally to frequently, including steps and stairs, but he would have difficulty climbing a ladder when carrying at the same time certain objects. He has compromised ability to reach overhead while performing cell or body search, has compromised ability in performing arm movement in the left weak upper extremity and, as I have already discussed, [he is] compromise[d] in his ability to perform all the required tasks in the use of a side handle baton and in the restraint of an inmate."

■ As we have previously discussed, there is substantial evidence to support the SPB's determination as to what constitutes the essential job functions of a correctional lieutenant. There is thus substantial evidence to support the SPB's finding that Furtado could not perform the essential functions of his position as a correctional lieutenant, and that he was unable to perform the work of any peace officer position in a correctional institution.

In addition, the evidence demonstrated that Furtado was able to perform the work required to be an Associate Government Program Analyst. Furtado previously indicated his willingness to accept that position. The evidence thus supports the SPB's upholding of the Department's decision to medically demote Furtado after having considered the medical evaluation and other pertinent information.

---

work of his or her present position, but is able to perform the work of another position including one of less than full time, the appointing power may demote or transfer the employee to such a position."

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.

Nares, Acting P. J., and McIntyre, J., concurred.