Filed 6/10/21  Sasan v. County of Marin CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BETH SASAN et al., <br><br> Petitioners and Appellants, <br> v. <br> COUNTY OF MARIN, <br><br> Respondent. | A160325 <br><br> (Marin County <br> Super. Ct. No. CIV1801643) |

Beth and Tim Sasan appeal from the trial court's denial of a petition for writ of administrative mandamus challenging the Marin County Board of Supervisors' (the Board) denial of their design review application to build a new home on a San Anselmo hillside.  The Sasans contend the Final Resolution and supporting findings are legally defective and unsupported by substantial evidence.  We affirm.

## BACKGROUND

In July 2016 the Sasans applied to the Marin County Community Development Agency (the Agency) for discretionary design review of their plans for a 3,328 square foot single-family home.  As originally proposed, the residence included three levels of living space with a 749 square foot in-law unit on the lowest floor and a 637 square foot garage.  Sited on an open grassy hillside with an approximately 40 percent slope, the home would

1

extend 28 feet above the surrounding grade. The 73,833 square foot lot was composed of two parcels separated by an undeveloped public right of way (a "paper road") extending from the end of the paved portion of Sacramento Avenue.[1] At the same time the Sasans applied for a permit to remove two mature trees, a 12-inch heritage buckeye and a 6-inch protected coast live oak, from the proposed building site.

After the Sasans made some changes to their plans in response to planning staff and community concerns, in April 2017 the Agency approved their design review and tree removal applications. Unhappy with that decision, a group of neighboring homeowners who had opposed the project at the Agency level appealed it to the Marin County Planning Commission (the Commission). The appeal raised issues as to the incompatibility of the home's modern design with the character of nearby homes and the natural surroundings; its size, at nearly twice that of many neighboring properties; its inclusion of a second unit; and its siting on an exposed hillside where it would interfere with views from neighbors' homes.[2]

*The Planning Commission Hearing*

On June 12, 2017, the Commission held a public hearing on the neighbors' appeal. Curtis Havel, Senior Planner with the Marin County Planning Department (the Department), explained the Agency's recommendation to approve the application. The Sasans' representatives

---

[1] One of the neighbors who opposed the project commented that the 73,833 square foot figure improperly encompassed some or all of the paper road, and that, properly calculated, the actual lot size was 60,452 square feet.

[2] The objecting neighbors raised additional concerns that the project would interfere with the Sacramento Avenue public right of way, damage a nearby creek, and be subject to or cause slope failure. Those issues were not a basis of the Board's decision, so do not require discussion here.

spoke in favor of the project, and a number of neighbors spoke against it. The Commission also considered the Agency's staff report on the proposal, its administrative decision, the project plans, and supplemental memoranda forwarding 128 pages of public correspondence, primarily in opposition to the proposal. As reflected in this correspondence, many neighbors had attended meetings with the developer and repeatedly expressed concerns about the project's incompatibility with community character, its visual prominence and interference with views, and potential environmental impacts.

Included in the public correspondence was a December 2016 letter from neighbors Robin McKillop and John Herr that raised a number of concerns about the Sasans' proposal. Herr and McKillop objected that the house was much larger than most homes in the area and too large for its site; that no other homes in the area were built on such a steep slope; that the design incorporated a wall of massive windows that looked directly toward other homes; and that its "modern, box-like style . . . is completely out of character with many other homes in the neighborhood. . . . With over 17,000 square feet of impervious surfaces, retaining walls up to 12 feet in height, over 4,500 square feet of building area, and a road cut completely across the hillside, the choice of color and material is almost irrelevant."

After commenting on the "massive" fire truck turnaround to be constructed on top of the public right of way and "squarely in the center of the entire hillside[,]" McKillop and Herr commented that the home's proposed site on the upper parcel furthest from the developed portion of Sacramento Avenue "maximizes visual and privacy impacts to the surrounding neighborhood. . . . Neighbors who attended the meeting on February 24, 2016 provided feedback that the placement of a house lower on the hillside to minimize impacts to the surrounding neighborhood would be more favorable.

3

This feedback seems to have been entirely ignored." A number of other local residents also wrote in protest of the project's aesthetic and environmental impact on the neighborhood.

The Commission found the home's contemporary design was "distinctive" but "not uncommon and . . . compatible with the varied architectural styles in the vicinity." Further, it concluded, "while the proposed project is larger in size than some homes in the area, it is proportionally appropriate to the site, consistent with siting and layout patterns along Sacramento Avenue, incorporates adequately articulated building forms that disrupt the apparent mass and bulk of the structure, and blends into the architectural diversity representative of the neighborhood."

The Commission rejected the neighbors' concerns about the home's visually prominent location on an open grassy hillside, noting that it was not located on a ridgeline and would not block views of Mount Tamalpais and the Ross Valley. Moreover, it found the proposed design incorporated "adequate building articulation stepped foundations, and colors and materials that disrupt the visual mass and bulk of the structure. Furthermore, the project is sited to protect off-site views and privacy by preserving the large majority of mature woodland canopy for screening along the westerly and northerly areas of the site . . . . Finally, the development would orient its primary viewshed towards Mount Tamalpais to the south, thereby preserving the privacy of residential development to the west and north." The Commission rejected additional concerns about drainage, geotechnical problems and interference with the public right of way.

The Commission approved the project subject to conditions aimed at minimizing its visual impacts. While the modern design remained the same, the Commission required the Sasans to eliminate the lower-level living space,

reduce the size of two exterior terraces, incorporate earth-toned coloring and texturing on the retaining walls, add landscaping to screen the home and retaining walls, and provide a trail access easement. The Sasans revised their project plans accordingly.

*The Board of Supervisors Hearing*

The neighbors again appealed, this time to the Board. On March 13, 2018, the Board held a public hearing on the appeal. Mr. Havel described the project and presented the Sasans' plans before and after they incorporated the modifications required by the Commission. The home's overall height and size had not changed despite the elimination of the in-law unit. Instead, the new design showed a blank wall partially screened by landscaping where there was previously a series of windows along the lowest level. The prominent fire truck turnaround surrounded by concrete retaining walls remained in the design. Havel explained, "The length of the driveway is approximately 280 feet from the edge of the pavement to the end of the driveway. The retaining walls vary anywhere from delighting [sic] at grade up to 11 feet, where we're gonna see the highest retaining walls are in the turnaround area and the driveway area" on both uphill and downhill sides of the road.

Project developer Paul Thompson spoke in favor of the project. He explained, "[t]he Planning Commission approved the development with conditions in 2017, which obligated us to delete the in law unit, which we did not want to do, and it reduced the size of the home . . . . We agreed to comply with these conditions despite it being, we thought a loss to the property, to the home. We have accommodated every request the neighbors have put on the table. Staff has carefully evaluated every one of the neighbor's comments. The neighbors have contested the project every step of the way,

5

and we have . . . tried to be a responsible developer and accommodate them to the best we can. What the board has in front of you is exactly what the neighbors wanted. There is the exception of the neighbors that don't want any development in that area."

Brandon Sullivan is one of the neighbors who challenged the Commission's decision. He spoke at the hearing and criticized Havel's presentation as "missing . . . an appreciation for the site from the existing homes in the neighborhood[,]" noting Commission members and staff had described the site as "an open hill side" and "a fish bowl." Sullivan elaborated, "[t]he home projects up and out, and is oriented directly towards the existing home along Miwok Drive. . . . The visual prominence of the project is not limited to the home itself. This requires a 300 foot extension of Sacramento Avenue. It cuts down and across the hill side with 800 cumulative feet of retaining walls, ranging upwards of 11 feet tall. The fire truck turnaround is cut into the very top of the property exposed with its own retaining walls." Sullivan emphasized that the project's "modern corporate looking" design was incompatible with the neighborhood.

Neighbor Rick Block also addressed the project's incompatibility with the neighborhood and surrounding area: "[I]n addition to blocking the public right of way, the location of the proposed house is probably the worst possible location with regards to visual prominence and impact to privacy. It makes no sense to locate this house at the highest elevation on the exposed hill side, exactly where two native trees have been growing for years and at the location furthest from the paved end of [ ] Sacramento Avenue. [The] project calls for construction of over 800 [feet of] retaining walls up to 11 feet high. These unsightly walls, and dominating house would be visible throughout our neighborhood. Most of the trees on this lot are located much lower on the

6

site, too low to provide screening for this development.  The two trees that might provide some screening are s[l]ated for removal."

Mr. Block commented that "[o]ne of the least desirable elements of the house is orientation directly towards our homes along Miwok Drive.  The impact[s] to our privacy are enormous and can't be remedied simply by planting more trees.  Because of the topography of our small valley, it's critical that homes be [sited] in a way that respects nearby properties.  Thoughtful orientation and window placement are key."  As proposed, almost 20 large windows on the side of the Sullivan's house would directly face neighboring homes.  "No other homes on either side of the valley face directly towards the main living area of another home.  The proposed house should be no exception."

Block also criticized the home's design.  "[N]o other homes in our neighborhood [have] quite this level of modern contemporary design, like the proposed house. Existing homes in the neighborhood are primarily craftsman style with materials, colors and design elements, carefully selected to better blend with the natural surroundings.  The boxy design of the house is not suite[d] for our neighborhood adjacent to open space."

Neighbor John Herr, whose home is opposite the proposed building site, voiced similar concerns about the project's impacts on views and the local environment.  Four other neighbors spoke about the project's encroachment on the public right of way, its noncompliance with state and local requirements for roads and driveways, and the fire dangers associated with increased density.  Mr. Havel then revisited various technical and legal matters related to the right of way, geotechnical issues, the possibility of merging the Sasans' two parcels, and environmental and growth-inducing impacts from the project.

7

When the Board took the matter up for discussion, Supervisor Katie Rice commented that "significant re-siting of the home would allow for serious reduction on the length of driveway, retaining wall and all that, which would be better for visual impact. Half of the visual impact of this project is not the home itself, it's all the infrastructure that's necessary to get to that site." If the paper street were abandoned, something the County does "all the time," the home could be re-sited in such a way as to significantly reduce its visual impact. Supervisor Rice stated she "would look favorably and ask [her] colleagues to look favorably on a street abandonment that would result in a better [siting] of this home, should a project come forward in the future."

The supervisor proposed the Board uphold the appeal without prejudice and suggested that "staff . . come back with a resolution that would speak to my objection, and hopefully—around the current project's visual impacts, the amount of graying bulk mass of the driveway and structure in its current location. All these issues could be mitigated significantly with a more appropriate [siting] of the home." She encouraged the Sasans to submit a revised project "that would do as much [as] possible to modify the home design to minimize that sort of outward facing bulk, and maybe a change in design style. I ask that, and I leave it to your discretion to be more compatible with the neighborhood." A second supervisor commented, "I can very much understand the neighbor's concerns, the visual impacts of the site as currently proposed."

The Board voted to deny the Sasans' applications. At its direction, Department staff prepared and the Board unanimously executed a Final Resolution stating its findings and decision.

*The Final Resolution and Supporting Findings*

The Final Resolution includes 12 findings in support of the Board's decision. Findings IX through XII address the project's compliance with Marin County policies, ordinances, and its Countywide Plan.

In Finding IX, the Board overturned the Commission's approval on the basis of the project's incompatibility with county policies regarding siting, mass, and scale. The finding states: "The siting of the proposed residence and appurtenant improvements (driveway and retaining walls) would result in development that is visually obtrusive and would require excessive site disturbance. The length of the proposed driveway would require over 1,000 cubic yards of earthwork, and include retaining walls up to 11 feet in height. The length of the driveway, height of retaining walls and amount of site disturbance would contribute to the project's excessive visual prominence on the property. The design of the residence is visually intrusive due to its three-story appearance, modern angular design and lack of effective building articulation on both horizontal and vertical planes."

Findings X and XI elaborated on the Board's reasoning. In Finding X the Board found the project was inconsistent with requirements of Marin's Countywide Plan "because the residence and driveway would far exceed the visual scale, mass and bulk of adjacent development and would not respect the characteristics and constraints of the site." It explained, "the surrounding pattern of development along Sacramento Avenue is characterized by homes sited close to the right-of-way on both the uphill and downhill sides of the Sacramento Avenue right-of-way. Although the proposed residence would be located just uphill of the Sacramento Avenue right-of-way, the home is sited over 300 feet from the edge of the existing pavement of Sacramento Avenue.

9

"The approximately 300-foot extension of the paved portion of Sacramento Avenue would require extensive earthwork, and construction of retaining walls up to 11 feet in height. The height and length of the retaining walls would stand out in stark contrast to the existing open grassy hillside, and in contrast to roadway improvements along Sacramento Avenue where retaining walls are much lower in height (typically not exceeding 6 feet in height). The driveway/roadway improvement would be visually obtrusive and inconsistent with the development patterns along the existing street.

"The proposed residence would be located on an open, grassy hillside, far from the edge of pavement and isolated from adjacent development along Sacramento Avenue. The location of the home on the site amplifies its mass and scale due to the open nature of the grassy hillside and a lack of existing mature vegetation to provide partial screening of the structure. Furthermore, the home design currently presents a three-level design that does not minimize the apparent mass and bulk of the building."

For these reasons, the Board found the Sasans' proposal also failed to comply with a number of Marin County's mandatory design review criteria (Finding XI, Marin County Code §22.42.060).[3] Among other things, the

[3] Marin County Code Section 22.42.060 provides as follows: "The Review Authority shall issue the decision and the findings upon which the decision is based. The Review Authority may approve or conditionally approve an application only if all of the following findings are made: [¶] A. The proposed development complies with either the Single-family or Multi-family Residential Design Guidelines, as applicable, the characteristics listed in Chapter 22.16 (Discretionary Development Standards) and any applicable standards of the special purpose combining districts provided in Chapter 22.14 of this Development Code. [¶] B. The proposed development provides architectural design, massing, materials, and scale that are compatible with the site surroundings and the community. [¶] C. The proposed development

10

Board found that (1) the project's scale and mass were incompatible with the surroundings (Finding XI.A); (2) it would adversely affect neighbors' views "because the project would stand out in stark contrast to the surrounding natural and built environments" (Finding XI.B); (3) it required excessive grading and earthwork (Finding XI.D); and (4) it was visually out of scale with other development in the vicinity and incompatible with the site conditions (Finding XI.E).[4]

In Finding XII the Board rejected the Sasans' application to remove the mature oak and buckeye trees pursuant to Marin County Code section 22.62.050,[5] based on its determinations that the need to remove *any* trees

results in site layout and design that will not eliminate significant sun and light exposure or result in light pollution and glare; will not eliminate primary views and vistas; and will not eliminate privacy enjoyed on adjacent properties. [¶] D. The proposed development will not adversely affect and will enhance where appropriate those rights-of-way, streetscapes, and pathways for circulation passing through, fronting on, or leading to the property. [¶] E. The proposed development will provide appropriate separation between buildings, retain healthy native vegetation and other natural features, and be adequately landscaped consistent with fire safety requirements.

[4] The Board rejected additional objections to the project related to CEQA, the Subdivision Map Act and obstruction of the right of way.

[5] Section 22.62.050 of the code provides that "In considering a Tree Removal Permit application, the Director may only grant approval or conditional approval based on a finding that removal of the tree(s) is necessary for the reasonable use and enjoyment of land under current zoning regulations and Countywide Plan . . . . policies and programs, taking into consideration of the following criteria: [¶] A. Whether the preservation of the tree would unreasonably interfere with the development of land; [¶] B. The number, species, size and location of trees remaining in the immediate area of the subject property; [¶] C. The number of healthy trees that the subject property can support; [¶] D. The topography of the surrounding land and the effects of tree removal on soil stability, erosion, and increased runoff; [¶] E.

11

could be avoided by re-siting the structure southward on the Sasans' property and that retaining existing trees around the project site would provide screening and privacy.

*The Writ Petition*

The Sasans filed a petition for writ of administrative mandamus in the superior court challenging the Board's decision. Following briefing and a hearing, the court found the Board's findings were supported by substantial evidence and that they supported its decision to reject the project.

The court noted that the evidence before the Board included the project plans before and after modification and the neighbors' testimony and written objections. This evidence, the court concluded, "satisfies the *Topanga*[6] standard. This Court had no trouble discerning the analytic route the Board took to arrive at its Resolution from the Evidence before it. . . . Although this Court likely would not have arrived at the same decision as the Board of Supervisors, a reasonable person could have reached the conclusion reached by the Board on the basis of the evidence before them. For this reason, this Court finds substantial evidence supports the Board's findings, and the findings support the Board's decision."

The Sasans filed this timely appeal.

---

The value of the tree to the surrounding area with respect to visual resources, maintenance of privacy between adjoining properties, and wind screening; [¶] F. The potential for removal of a protected or heritage tree to cause a significant adverse effect on wildlife species listed as threatened or endangered . . . . [¶] G. Whether there are alternatives that would allow for the preservation of the tree(s), such as relocating proposed improvements . . . ."

[6] *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 (*Topanga I*).

12

## DISCUSSION

The Sasans contend the Board's findings and Final Resolution are legally defective and unsupported by substantial evidence. As shall be seen, neither contention has merit.

### I. Legal Framework

Code of Civil Procedure section 1094.5 provides the procedure for judicial review of adjudicatory decisions rendered by administrative agencies.[7] (*Topanga I, supra,* 11 Cal.3d at p. 514.) Where, as here, the underlying administrative mandamus case does not implicate a fundamental vested right, we review the administrative decision, not the trial court's ruling. (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 418-419 (*Young*).) We " 'consider whether the administrative agency committed a prejudicial abuse of discretion by examining whether the findings support the agency's decision and whether substantial evidence supports the findings in light of the whole record.' " (*Id.* at p. 419.)

### II. The Findings Are Legally Adequate

The Sasans contend the findings are legally inadequate because (1) they fail to demonstrate the Board's analytical route between the evidence and its decision to uphold the appeal; and (2) they are inadequately linked to supporting evidence. We disagree.

We have no difficulty concluding the Board's findings adequately reveal "the analytic route the administrative agency traveled from evidence to action." (*Topanga I, supra*, 11 Cal.3d at p. 515; *Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 516-517 (*Environmental Protection*).) " '[I]mplicit in section

_____

[7] Further statutory citations are to the Code of Civil Procedure.

13

1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order . . . . By focusing . . . upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route." (*Topanga I, supra,* 11 Cal.3d at p. 516.)

The deciding agency's findings must thus be "sufficient to enable the parties to determine whether and upon what basis they should seek review and to allow a reviewing court to determine the basis for the agency's action. [Citation.] However, great specificity is not required. It is enough if the findings form an analytic bridge between the evidence and the agency's decision. [Citation.] In addition findings are to be liberally construed to support rather than defeat the decision under review. [Citation.] '[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency "in truth found those facts which as a matter of law are essential to sustain its . . . [decision]." [Citations.]' " (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1356 (*Topanga II*); *Environmental Protection, supra,* 44 Cal.4th at p. 5l6.)

The Board's findings satisfy this standard. Reference to the administrative record leaves no mystery about the Board's reasoning or that it "in truth found those facts" (*Topanga II, supra,* 214 Cal.App.3d at p. 1356) supporting its conclusion that the project as designed violated county codes

14

and policies. Indeed, the findings are explicitly linked to facts about the project and site that informed the Board's judgment. In Findings X and XI.A, for example, the Board found the project inconsistent with both provisions of the Countywide Plan regarding mass, scale and visual quality and with section 22.24.060A of the county code, which similarly requires that a project's design, massing, material and scale be appropriate to and compatible with the site, surroundings and community. It supported those findings with a detailed description of the home's siting on an open, grassy hillside away from the existing road and structures; the tall, visually obtrusive retaining walls and extensive earthwork required for the project; a three-story design that failed to minimize the home's apparent mass and bulk; and the lack of mature screening vegetation. This was more than sufficient to "enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the [agency's] action." (*Topanga I, supra,* 11 Cal.3d at p. 514; *Great Oaks Water Co. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 971.)

Inspection of the Final Resolution also compels us to reject the Sasans' claim that the findings are legally inadequate because they "simply recite boilerplate findings that parrot the [county's] Design Review criteria." (See *Topanga I, supra,* 11 Cal.3d at p. 517, fn.16 [disapproving certain cases that endorsed findings made solely in language of the applicable ordinance]; but see *Young, supra,* 10 Cal.App.5th 408, 421-424 [distinguishing *Topanga* to hold that findings may be stated in the language of the relevant ordinance when the ordinance sets out the specific findings that must be made].) To the contrary, the Board stated fact-based, project-specific findings in support of

15

its determination that the project was incompatible with specific provisions of the county's codes and policies.

The Sasans also protest that the Final Resolution fails to expressly cite the particular evidence the Board relied on for its findings. "In other words," they argue, "the Board Resolution fails to show that the County considered neighbor testimony, or the slide [depicting the project] in reaching its findings." We disagree. The Sasans as much as concede there is no legal requirement that design review resolutions and findings must include specific citation to the administrative record. Indeed, such a requirement would be at odds with the established rule that findings " 'are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein' " and "do not need to be extensive or detailed." (*Young, supra,* 10 Cal.App.5th at p. 421, italics omitted.) In any event, it is plain from the record that the Board reviewed the project documentation, considered the neighbors' input on the proposal, and concluded from those sources that the project violated county design review criteria. The Sasans' claim that they were "left guessing as to why the application was denied" lacks credibility particularly since they concede the Board at least "allegedly" relied on "neighbor opinions (and one drawing)."

Pursuant to Marin County Code section 22.42.060, failure to make any one of the required findings must result in denial of the application. Accordingly, it is not necessary for us to determine that each of the findings was legally sufficient and supported by substantial evidence. "As long as the Board made a finding that any one of the necessary elements enumerated in the ordinances was lacking, and this finding was itself supported by substantial evidence, the Board's denial of appellant's application must be

16

upheld." (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 337 (*Desmond*).)

### III.    *Substantial Evidence*

The Sasans assert the trial court erred by ignoring the evidence that supported the Commission's decision to approve the project instead of considering all the evidence in the administrative record. Even were this claim substantiated by the record, which it is not, it is irrelevant. "On appeal from the denial of a petition for writ of mandate, our role is identical to that of the trial court with respect to the administrative record. That is, both the trial and appellate courts must determine whether the record is free from legal error. Thus, the trial court's conclusions and disposition of the issues are not conclusive on the court of appeal." (*Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 863.)

To the extent the Sasans' argument is, rather, that the *Board's* decision is unsupported by substantial evidence, we disagree. In applying the substantial evidence test to an administrative decision governed by section 1094.5, "a court must examine all relevant evidence in the entire record, considering both the evidence that supports the Board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence. [Citation.] This does not mean, however, that a court is to reweigh the evidence. Rather, all presumptions are indulged and conflicts resolved in favor of the Board's decision." (*Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 742 (*Furtado*).) Having conducted the review prescribed in *Furtado,* we are satisfied the project documents and the neighbors' written and oral input on the project's impacts on their neighborhood provided a sufficient basis, i.e., evidence that is " ' ' "reasonable in nature, credible, and of solid value" ' " ' " (*Ofsevit v. Trustees of Cal. State*

*University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9), for the Board's findings that the project was inconsistent with county policies and design review criteria.

The Sasans disagree, asserting, as we understand it, that the Board should not have placed weight on the neighbors' statements. They are mistaken. "Consideration of [a project's] overall aesthetic impact . . . by its very nature is subjective. Opinions that [the project] will not be aesthetically pleasing is not the special purview of experts. Personal observations on these nontechnical issues can constitute substantial evidence." (*Ocean View Estates Homeowners Assn., v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 (*Ocean View Estates*); *Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 176-177 [in design review proceeding, opinions and objections of neighbors can provide substantial evidence to support rejection of proposed development]; *Desmond, supra,* 21 Cal.App.4th at pp. 337, 339 ["It is appropriate and even necessary for the County to consider the interest of neighboring property owners in reaching a decision whether to grant or deny a land use entitlement, and the opinions of neighbors may constitute substantial evidence on this issue"]; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 973-974 [expression of opposition by members of neighborhood coalition was substantial evidence in support of incompatibility findings].)

Here, multiple neighbors voiced their opposition to the project at the Board hearing and three of them specifically addressed the design and view-related issues. Many more submitted written opposition to the project. The Sasans dismiss this input because, they urge, the neighbors (1) were not competent to speak to whether the home could be re-sited elsewhere on the lot; and (2) were in no position to complain about the project, as at least two

18

of them also lived in three-story houses. As to the first point, the neighbors were competent to testify to the project's aesthetic impacts on their homes and neighborhood. (*Ocean View Estates, supra,* 116 Cal.App.4th at p. 396.) The second point merely invites us to reweigh the evidence, which of course we may not do. (*Furtado, supra,* 212 Cal.App.4th at p. 742; *Young, supra,* 10 Cal.App.5th at p. 419.)

Nor does it matter that, as the trial court acknowledged, the administrative record contains evidence that could support the opposite decision to grant the Sasans' application. "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's [determination] on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard Area Citizens for Responsible Growth, Inc., v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)

Finally, we are also satisfied the record supports the Board's decision to deny the Sasans' tree removal application. The Sasans emphasize the evidence supporting *the Commission*'s *decision* to grant the permit and its finding that the home could not be re-sited below the Sacramento Avenue right of way without removing additional trees. But, again, it does not matter if the Board could have reached the same conclusion as the Commission on the evidence before it. The question, rather, is whether there was substantial evidence for the Board's contrary determination that the Sasans could avoid the need for any tree removal by shifting the building site southward on the lot.

We conclude there was substantial evidence. The documentation before the Board showed the property's boundaries and constraints, including the

19

topography and the unbuildable right of way.  Apprised of those factors, and well-suited to evaluate the possibility of legally abandoning the undeveloped right of way to expand the options for siting the project, the Board had an adequate basis for its finding that the home could be built in a different location without sacrificing existing trees.

In sum, our independent review of the administrative record shows that the Final Resolution is legally sound and supported by substantial evidence.  We therefore will not disturb it.

## DISPOSITION

The order denying the petition for administrative mandamus is affirmed.  Respondent is awarded costs on appeal.

_____
Wiseman, J.*

WE CONCUR:


_____
Petrou, Acting P.J.


_____
Jackson, J.

*Sasan v. County of Marin*, A160325

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.